PATRICK *v.* BOWMAN.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MISSOURI.

No. 157. Argued March 22, 23, 1893. — Decided April 24, 1893.

B., an attorney at law, residing at St. Louis, went to Leadville, Colorado, on business of P. While there he obtained knowledge of a mineral tract, and after communicating with P., he acquired a part ownership in it on behalf of P. and himself. P. came to Colorado and took charge of the development of the property by sinking a shaft, the proportionate part of the expense of which was to be borne by B., who then returned to his business. Subsequently a correspondence by mail and by telegraph took place between P. and B., which ended in the acquisition of B.'s interest by P. The property became very valuable. When B. learned this he filed a bill in equity to set aside his conveyance to P., as having been fraudulently obtained, and for an accounting, and for the payment of his share of the profits to him by P. On the correspondence and other facts

in evidence, as recited and referred to in the opinion of the court, *Held*, that the evidence showed that the parties had made a complete settlement of their rights under the contract, and that B. had parted with all his interest in the property, and the bill must be dismissed.

When an offer is made and accepted, by the posting of a letter of acceptance before notice of withdrawal is received, the contract is not impaired by the fact that a revocation had been mailed before the letter of acceptance.

THIS was a bill in equity originally filed by Bowman in the Circuit Court of St. Louis, and subsequently removed to the Circuit Court of the United States, against William F. Patrick and James M. Patrick, to rescind a sale made October 19, 1882, by Bowman to William F. Patrick, his then partner, of a $\frac{5}{48}$ interest in the Col. Sellers and Accident mines at Leadville, Colorado, and for an account of profits received by Patrick from that interest. The theory of the bill was that Patrick had concealed from the plaintiff the discovery of ore in one of these mines in the summer of 1882, and thereby induced him to part with his interest at much less than its value.

The facts of the case were substantially as follows: In February, 1882, Bowman, then a resident of St. Louis, Missouri, and temporarily in Leadville on legal business, as attorney of William F. Patrick, was introduced by one William H. Wilson, a mining promoter, to one Stebbins, who with others owned two adjacent mining claims in Leadville known as the Col. Sellers and Accident claims, upon which no shaft had then been sunk to mineral, and it was then unknown whether the property had any value. The owners were looking for some one who would sink a shaft for a share in the property. Bowman, at Stebbins' request, visited the property, was pleased with it and its surroundings, and soon afterwards asked Patrick to join him in sinking the shaft. The result was that on February 17, 1882, an agreement was entered into between Stebbins and the other owners of the mine upon one part, and Bowman and Patrick upon the other, by which the latter undertook, in consideration of an undivided one-half of the property, a deed of which was deposited in escrow, to sink a shaft on the property to limestone in place or bed rock, if pay mineral

should not be sooner found, and to obtain patents from the United States to said property, and further agreed to commence work in sinking the shaft within thirty days from the date of the contract. It seems the mineral in that district lies in nearly horizontal bodies, at the contact between porphyry and limestone, the porphyry being the overlying rock and of varying thickness. The shaft was to be sunk through the surface earth and gravel known as "wash" and the porphyry. The indications are generally apparent in the shaft, if there be an ore body below and it be near, the porphyry becoming iron stained, and sometimes small seams or stringers of mineral are found in the porphyry leading to the mineral body below.

Bowman and Patrick were, between themselves, to be equal partners in the venture, each paying half of the expenses. Patrick, living at Leadville, was to superintend the sinking of the shaft, and keep Bowman advised of all that should happen in the partnership venture. In March, 1882, and for some time afterwards, Patrick was indebted to Bowman for money advanced by him on account of certain legal business then in his charge. Bowman returned to St. Louis and did not meet Patrick again until June 19th, when they had a settlement, at which Bowman exhibited a willingness to sell out his interest to Patrick. A correspondence, both by letter and telegram, began soon after that date, which is fully set forth in the opinion of the court, and which resulted in a deed by Bowman of his entire interest in the property.

Upon the hearing in the Circuit Court upon pleadings and proofs, a decree was entered setting aside the sale, and adjudging that William F. Patrick refund the sum of $57,099.69, the amount of profits received by him on Bowman's interest to March 19, 1889, the date of the final decree. 36 Fed. Rep. 138. From that decree Patrick appealed to this court.

*Mr. Charles C. Parsons* for appellant.

*Mr. E. McGinnis* for appellee.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

This case turns upon the question whether the correspondence between these parties subsequent to the execution of the contract of February 17, 1882, and the conduct of Bowman in that connection indicated a completed understanding between them, prior to the discovery of ore in paying quantities, that Patrick was to purchase Bowman's interest.

The theory of the plaintiff in this connection is that Patrick, being present on the spot, and having the sole charge and management of the sinking of the shaft, was bound to keep the plaintiff advised of the progress of the work and the prospects of the mine, pending the negotiations for the purchase of his interest, and that, having failed to apprise him of the discovery of a large body of ore on the 31st of August, the sale subsequently made was fraudulently procured and should be annulled. The defendants do not dispute the legal principle laid down by this court in *Brooks* v. *Martin*, 2 Wall. 70, that where or e partner is present in sole charge of the business, while the other is at a distance, in order to sustain a sale of the absent partner's interest it must be made to appear that the price paid approximates a fair consideration for the thing purchased, and that all the information in the possession of the purchaser necessary to enable the seller to form a sound judgment of the value of what he sells should be communicated by the buyer to him. Defendants, however, claim, that the parties had reached an understanding as to the terms and conditions of the sale before the discovery of the ore, and that William F. Patrick was under no obligation to apprise plaintiff of this fact; that even if the plaintiff had a right to rescind the sale, he did not act with sufficient promptness, and that his failure for four years to institute these proceedings should debar him from a recovery.

The nature of the defence in this case requires a statement somewhat in detail of the succession of events following the contract of February 17, 1882, and of the correspondence between the parties. Bowman seems to have left Leadville

the day following the execution of the contract with the understanding that Patrick should remain there, and superintend the. opening of the shaft — in short, that he should be the resident partner of the enterprise. He and Bowman were each to contribute one-half, and to have an equal interest in the venture. On March 25th, Bowman sold to James M. Patrick, brother of the defendant, William F., one-third of his half interest, in consideration of Patrick paying one-third of Bowman's share of the cost of sinking the· shaft, Bowman agreeing to make all necessary advances for· the first·year, and Patrick agreeing to repay him the sums so advanced. Bowman did not return to Denver until early in May, having in the meantime received several letters from William·F. Patrick, giving a general idea of the progress of the work, and ·of certain litigation connected with the property.

At this time, Wilson claimed that he had introduced. Bowman to Stebbins, and had been instrumental in procuring for Bowman the contract for an interest in the property, and that in fairness Bowman should let him have a share in this contract. Bowman assented to this, and assigned to Wilson a one-fourth interest. At this visit, too, a settlement seems to have been had in which it was agreed that Bowman would owe Patrick $288.70, if Wilson paid his assessment, and ·$465 if he did not. And, as. Patrick says, "the understanding between Mr. Bowman and myself was that I was to draw for either $465 or $288.70." Wilson's time to pay would expire May 18th. On May 13th, Patrick drew on Bowman for $465. This draft was presented for payment on May 15th, when Bowman telegraphed to Patrick : " Must know Wilson's conclusion. Rebates not satisfactory. Answer at once ;" and on the same day wrote to Patrick· as follows : " Wilson made a claim . . . for an interest in the Col. Sellers and Accident. I yielded to his request. . . . He named the interest and promised his share of the money. You were to collect of· him, or forfeit his claim for non-payment. Your brother's interest I agreed to carry, and am willing to, but now you draw on me without collecting of Wilson or securing his relinquishment. This much I expected you to do. I have

telegraphed you, but can get no answer. I leave in an hour for Chicago."

The parties did not meet again until June 19th, when Patrick went to St. Louis to talk over the Col. Sellers matters, and at this interview they had a settlement of their accounts up to May 8th, in which a balance of $288.69 was found due from Bowman, for which he gave his note to Patrick, who had it discounted at once for its face. Of this $288.69, the sum of $245.75 was for James Patrick's share of the expenses, which Bowman was to advance for him, and for which amount James soon afterwards gave his note to Bowman.

In the meantime, and on May 11, Wilson had assigned his interest to John Livezey. These assignments to James Patrick and Wilson left Bowman the owner of ten forty-eighths of the contract, or five forty-eighths of the entire property, which was the interest he subsequently conveyed to William F. Patrick. Up to the time of this interview of June 19th, nothing, apparently, had been said with reference to a sale. But at the time of this settlement, it seems that Bowman, who appeared despondent, suggested to Patrick that he thought he only ought to do a little work every ten days as specified in the contract, to prevent its becoming forfeited, and that that would keep it alive. Patrick says: " He made me a proposition at that time, as I remember, after I secured this note, if I would surrender the note he would surrender all his right, title and interest under that contract to me, and I told him at the time that I had about all that I could carry, and I didn't think I could afford to take it, but thought I knew a man out West who I thought would take it, and that on my return I would speak to him in regard to it."

At this interview Bowman told him that he was going to leave in a few days for Bayfield, Wisconsin, and gave him that as his post-office address during the summer. Patrick started back for Leadville that evening, and on arriving at Denver wrote Bowman at St. Louis, under date of June 22d, as follows : " In regard to your interest in the Col. Sellers, I think I know a man who will pay the note you gave me, $288.69, and take your interest off your hands and let me go

right ahead with the work, which I would very much like to do. If you are willing to let it go on these terms, which is the same proposition you made me in your office, please telegraph me immediately and I will try and make the arrangement."

On June 27th he wrote another letter in the following terms: "I would also like to have an answer with regard to the proposition I made you about the Col. Sellers, to return you your note and forfeit your share in the contract. There is a party here who will take it." On the following day, June 28th, he wrote still another letter to this effect: ".Please let me know what we are to do in this new complication, and also about the Col. Sellers, as I am anxious to continue work on that property and see what is there." These letters were all addressed to St. Louis, and were forwarded to Bayfield, Wisconsin, and as Bowman was then in the woods, he did not receive either of them until the 13th of July, when he received the one of June 22d, and at once telegraphed to Patrick: "Yours of June 22 received yesterday; proposition accepted; send note." To this Patrick replied, under date of July 15th, by telegraph: "Acceptance too late. Proposition was dependent upon immediate acceptance in St. Louis. See my letter of fifth." Bowman must have gone to St. Paul on this or the following day, since on July 16th he wrote Patrick the following letter: "When I came out of the woods I found your letter of June 22d waiting my answer, and I telegraphed you on the same day, accepting your proposition to surrender to you all my remaining interest in the property adjoining the A. Y. on your surrendering my note; and on a perusal of your subsequent letters received here at St. Paul to-day. I learn that is your wish; I do not complain of it. My judgment differs from yours as to the course to pursue, and I should not stand in your way, and will not; if you wish any papers signed, send and I will sign them. My address is Bayfield, Wis."

Before Bowman received Patrick's letters, and telegraphed his reply, Patrick claims that he wrote the following letter to Bowman on July 5th, addressed not to St. Louis or to Bayfield, but to St. Paul:

"LEADVILLE, *July* 5, 1882.

"Mr. Frank J. Bowman, Merchants' Hotel, St. Paul, Minn.

"DEAR SIR: I send you a statement of all amounts paid on the Col. Sellers contract since our settlement from which you will see that the am't due from you thereon is $952.32 for which am't I will draw on you to-morrow. I wish to notify you and hereby do so, that if the draft is not paid that I will apply to Stebbins and Robinson and their partners for a new contract in my own name. I have consulted an attorney here and am satisfied that we are obliged to continue the work in order to comply with our contract and that your plan of doing a little work every ten days would not be acting according to its letter or spirit and would cause a forfeiture of the contract and loss of the am't we have spent in sinking the first 100 feet. The same attorney also tells me that under our contract if you do not pay your proportion when called upon you forfeit your rights under said contract. I want to deal fairly with you and will tell you that in my opinion the shaft which is now 165 feet deep is looking very promising and I think we are not very far from the contact. My reasons for thinking so are that the porphyry is now heavily iron stained. Hope you will pay the draft and that we may continue the work together but if you do not I will have to protect myself and will do so by taking a new contract as I have said.

"I withdraw my offer to return your note of $288.70 dated June 19th 1882 in case you assign your interest in the contract to me.

"Yours truly          W. F. PATRICK."

On the following day Patrick drew upon Bowman for $952.32, which included the amount of James Patrick's share of the expenses and also part of certain expenses for repairing the shaft. The draft was mailed to the bank in St. Paul, and was returned to Patrick because Bowman was not at St. Paul. We see no reason to doubt that this draft was drawn in good faith, with the expectation that it would be presented to Bowman, though, as Patrick says, he did not think it would be paid, because of his conversation with Bowman at St. Louis

on June 19th, when he expressed himself as dissatisfied with the way the work was going on. The letter of July 5th seems never to have been received.

On August 2d, defendant wrote Bowman as follows, evidently in reply to Bowman's letter of the 16th of July : "Yours of the 16th ult. received. In accordance with your request therein, I send the within paper for your signature. I sold the note in St. Louis before getting your reply, so will have to wait until it matures, which will be September 19th." Enclosed in this letter was a memorandum of agreement, signed by William F. Patrick, reciting the contract of February 17th, 1882; the performance of considerable work in developing the lode; the unwillingness of Bowman to continue such work or to pay the costs; the execution of the note of June 19th, 1882; and providing that, *if* Patrick should pay the note when it became due, Bowman would release to him all his right, title, and interest to the contract with the owners of the property, and would execute and deliver to Patrick a good and sufficient deed of conveyance of the same, Patrick agreeing to release Bowman from any liability under the contract.

In reply to this, and on August 28th, Bowman wrote to Patrick from his camp on Brule River, Wisconsin, as follows : "I send you the contract you desire, and trust that this will settle our matters pleasantly and amicably. I have inserted a clause concerning your brother's interest, but he may not care to retain it. My address will be St. Paul, until September 10th, then I shall return to St. Louis and business. P.S.— Mails are slow here."

With this letter was a contract signed by Bowman, which was a substantial copy of the one signed by Patrick, but containing a reservation for the use of Patrick's brother. This contract, however, made it obligatory upon Patrick to pay the note, and gave him no option in that particular as was given in the contract enclosed in his letter to Bowman.

Having signed this contract, Bowman enclosed it in his letter of August 28th, and mailed it the same day to Patrick at Leadville, where it arrived after Patrick had left. It was forwarded to him at Knoxville, Tennessee, where he received

it on September 7th. He made no reply, however, and there was no further correspondence between the parties.

On October 19, 1882, Bowman having returned to St. Louis, James Patrick went to Bowman's office, and said he had called by request of his brother, to get him to execute a deed to his brother for his interest in the Col. Sellers. The Patricks testify that they were both present in Bowman's office; that they talked over the matter of Bowman's relations to James with regard to an interest in the contract; and that W. F. Patrick then agreed to take a conveyance of Bowman's entire interest, to assume Bowman's liability, and to advance James' share of the expenses. This matter being settled, Bowman acknowledged and delivered a deed of his interest in the property. There is a dispute between Bowman and the Patricks as to whether the former made any inquiry of them as to whether any mineral had been discovered in the Col. Sellers shaft. It is clear they never mentioned the matter to him, and there is no doubt Patrick failed to inform Bowman of the discovery of a large body of ore that had been made in the last days of August. If, at that time, there was a completed understanding between them that Patrick was to buy out Bowman's interest and release him from his liability upon the note, there was no obligation to make such disclosure. If, upon the other hand, no such understanding had been reached, it was then incumbent upon Patrick to inform Bowman of the progress of the work before taking from him the deed of October 19th.

We think this question must be answered by referring to the correspondence between these parties, between June 19th and August 13th, upon which day the first indication of mineral was discovered in the shaft, the policy of suppressing all information was inaugurated.

The letter of June 22d must be read in connection with the conversation at St. Louis on June 19th, in which Bowman offered Patrick all his interest in the enterprise, if Patrick would return the note Bowman had just given him. Patrick replied that he had already as much as he could carry, but upon his return to the West he would speak to a man whom

he thought might take the offer. Accordingly, in his letter of June 22d, he does not offer to buy Bowman's interest himself, but says: "I think I know a man who will pay the note you gave me, $288.69, and take your interest off your hands. . . . If you are willing to let it go on these terms, which is the same proposition you made me in your office, please telegraph me immediately, and I will try and make the arrangement." Now, while it is true this is not upon its face a proposition to buy Bowman's interest himself, but a mere promise to try and make an arrangement with another party, and a call upon Bowman to let him know whether such a proposition would be accepted if made, in reality we think it should be considered as a proposition made by Patrick himself, for the following reasons:

The man he had in mind was Col. Bissell of Leadville, whom he had not yet seen, and whom he had no good reason to believe would take the property. It was a mere conjecture on his part. Before he wrote his next letter, he went on to Leadville, saw Col. Bissell, and " spoke to him in regard to it, and he declined to take it, and declined to take the interest and pay that note, and, as I told Bowman, I was carrying all I could." Notwithstanding this, in his letter of June 27th, he says: "*I would also like to have an answer in regard to the proposition I made you about the Col. Sellers, to return you your note and forfeit your share in the contract. There is a party here who will take it.*" And again on the 28th: "Please let me know what we are to do . . . about the Col. Sellers, as I am anxious to continue work on that property and see what is there." Now, it does not clearly appear whether he had seen Col. Bissell or not when he wrote these two letters; but in either case the letters were untrue, though they may have been written in good faith, and with the expectation that Col. Bissell would eventually take the interest; but there was no party there who had given him any assurance that he would. Patrick was thereby placed in the position of holding himself out not only as the agent of an unknown principal, but of one whom he had no authority to represent. In such case his contract, though of course not

binding upon any one else, is binding upon the agent, at least if the credit be given to such agent.    *Welch* v. *Goodwin*, 123 Mass. 71.; *Worthington* v. *Cowles*, 112 Mass. 30; *Cobb* v. *Knapp*, 71 N. Y. 348; *Blakely* v. *Bennecke*, 59 Missouri, 193; *Eichbaum* v. *Irons*, 6 W. & S. 67; *Meech* v. *Smith*, 7 Wend. 315; *Winsor* v. *Griggs*, 5 Cush. 210; Mechem on Agency, secs. 542, 550, 557.

In this case there is abundant evidence that the proposition contained in the three letters of June 22d, 27th, and 28th was treated by both parties as the proposition of Patrick himself. In his attempted retraction of July 5th, Patrick says: "*I withdraw* my offer to return your note for $288.70, dated June 19, 1882, in case you assign your interest in the contract *to me.*" And in his letter of July 16th, Bowman says: "When I came out of the woods I found your letter of June 22d, waiting my answer, and I telegraphed you on the same day accepting *your proposition* to surrender *to you* all my remaining interest in the property adjoining the A. Y. on your surrendering my note." Of this letter Patrick says: "*I decided to accept* the proposition contained in the letter, and instead of applying to the owners for a new contract . . . I decided to accept the proposition which was contained in Bowman's letter of July 16th. I had a contract prepared such as he indicated he would sign in that letter, . . . and I sent that contract to him by mail after signing it myself." In his letter of August 2d, which was written before the discovery of ore, Patrick enclosed a contract for Bowman to sign, in which his own name is mentioned as grantee, and Bowman in his letter of August 28th also enclosed a draft of his own, in which also Patrick is named as grantee. So, too, in his letter of September 2d, Patrick says: "I sent you from Leadville an agreement concerning the Col. Sellers, in which I agreed to pay that note, $288.70, and you relinquish all rights under the agreement." The matter was finally consummated on October 19th, by a deed direct from Bowman to Patrick of his interest in the mine. Indeed, there is not a word of testimony, except as gathered from the three letters written in June, that the proposition was other than

that of Patrick himself. For these reasons we think the offer should be considered as one made by Patrick to take Bowman's interest in the mine, and release him from his liability upon the note.

The letter of June 22d, which was addressed to Bowman at St. Louis, was forwarded to Bayfield, Wis., and reached him in the woods at a distance from a telegraph office. He proceeded at once to Ashland, Wis., the nearest telegraph station, and on July 13th telegraphed Patrick as follows: "Yours of June 22d received yesterday; proposition accepted; send note." To this Patrick replied by telegraph, sent both to St. Louis and Ashland, as follows: "Acceptance too late. Proposition was dependent upon immediate acceptance in St. Louis. See my letter of the 5th." In view of the fact that Patrick was informed when in St. Louis, June 19th, that Bowman was about starting for the woods for the summer, and that his letters of June 22d, 27th, and 28th were sent to St. Louis, where he must have known that Bowman had gone, we do not think the acceptance was too late, although it might have been otherwise had the circumstances been such that a prompt reply must have been expected. After having sent this telegram, and before receiving the reply, Bowman left Ashland, and went to St. Paul, where he received the letters of June 27th and 28th, and answered them by his letter of July 16th, *renewing his acceptance of the proposition he had already made by telegram.* The tone of this letter certainly indicates that he had not received Patrick's telegram of July 15th when he wrote it. Indeed, it is improbable that he should have done so, as one copy of that telegram was sent to St. Louis and another to Ashland, after Bowman had left there.

These letters and telegrams, taken together, indicate a complete understanding between these parties that Bowman should sell out his interest in the mine to Patrick on condition that the latter released him from liability upon the note. It is true the letter of June 22d contained no definite proposition, but a mere offer by Patrick to see if he could find a purchaser, and hence Bowman's telegram of July 13th might **not**

be construed as binding Patrick to anything; yet the letter of June 27th did contain, or at least recognize a proposition as coming from Patrick himself, and Bowman's answer thereto of July 16th, construed in connection with his telegram, was a distinct acceptance of such proposition. Nor is this understanding affected by Patrick's attempted revocation of the offer in his letter of July 5th. Bowman denies that he ever received this letter, and as there is no direct evidence that he did, his denial must be accepted as conclusive. Under such circumstances the revocation is of no avail to release either party from the obligations of his contract. The authorities are abundant to the proposition that when an offer is made and accepted by the posting of a letter of acceptance, before notice of withdrawal is received, the contract is not impaired by the fact that a revocation had been mailed before the letter of acceptance. Thus, in the case of *Tayloe* v. *Merchants' Fire Insurance Co.*, 9 How. 390, in which the point decided was that a contract by correspondence was completed when the party to whom the promise was made placed a letter in the post-office accepting the terms, Mr. Justice Nelson, in delivering the opinion of the court, said (p. 400): "We are of opinion that an offer under the circumstances stated, prescribing the terms of insurance, is intended, and is to be deemed a valid undertaking on the part of the company, that they will be bound according to the terms tendered, if an answer is transmitted in due course of mail, accepting them; and that it cannot be withdrawn unless the withdrawal reaches the party to whom it is addressed before his letter of reply announcing the acceptance has been transmitted." This case was cited and followed in *Byrne* v. *Van Tienhoven*, 5 C. P. D. 344, and *Stephenson* v. *McLean*, 5 Q. B. D. 346. Other cases to the same effect are *Adams* v. *Lindsell*, 1 B. & Ald. 681; *Dunlop* v. *Higgins*, 1 H. L. Cas. 381; *Harris' case*, L. R. 7 Ch. 587; *The Palo Alto*, 2 Ware, 343; *Wheat* v. *Cross*, 31 Maryland. 99.

There is, indeed, in a case of this kind some reason for urging that the party making the revocation should be estopped to claim that his attempted withdrawal was not

binding upon himself; but this could not be done without infringing upon the inexorable rule that one party to a contract cannot be bound unless the other be also, notwithstanding that the principle of mutuality thus applied may enable a party to take advantage of the invalidity of his own act.

It is quite evident that Bowman himself regarded this as a settlement of his rights under his contract with Patrick, leaving only the details to be arranged between them. His conduct from this time indicates a clear intention on his part to abandon any further interest in the property. It is evident that he intended to make no further claim upon Patrick, and it is equally clear that Patrick could have sustained no further action against him for the expenses of sinking the shaft. Indeed, the testimony leaves it doubtful whether Bowman ever contributed anything more than a nominal amount of money to the enterprise. At the interview in St. Louis on June 19th there seems to have been a settlement had by him up to May 8th, in which Patrick claimed of him $552.93, three-eighths of the expenses up to May 8th, which was reduced to $288.69, by a credit of some $264.24, claimed by Bowman against Patrick, for which amount, less $264.24, he gave his note. He seems neither to have paid nor settled for any portion of the money expended by Patrick since May 8th; ($603.75,) nor to have given any assurances that the additional liabilities to be incurred would be met by him. He said that he was "hard up;" could not settle the expenses incurred since May 8th; asked Patrick to wait for him as a matter of accommodation; and suggested that only a little work should be done every ten days on the shaft — just enough to save a forfeiture of their contract. He not only made no provision for the payment of his note of June 19th, or of the further expenses which he must have known would be required, but apparently took no further interest in the sinking of the shaft; and manifested in his letter of July 16th a willingness to sign any papers Patrick might send him, and subsequently did sign a release of his interest to Patrick. There is much dispute between the parties as to whether Bowman made any inquiries with regard to the progress of the work on October

19th ; but it is scarcely presumable that he would have signed the deed at that time, without instituting very careful inquiries with regard to the work, unless he had treated the matter as abandoned — since from the time that had elapsed he must have known that it was either a success or a failure.   In a subsequent conversation with Wilson he said that his reason for selling out to Patrick was that he was not able to carry the assessments.   He made substantially the same statement to James Patrick, and added that, even if he had had money enough, the constant fear of litigation and " jumpers ". would have caused him to sell out, and wished him to express his congratulations to his brother upon the success of the enterprise.

In short, he gave no further attention to the matter for four years, when, from some letters between members of the defendant's family, which fell into his hands, he was apprised of the fact that a large body of ore had been discovered about the 31st of August, the knowledge of which Patrick had concealed from him.   Conceding that if the negotiations had then been open, it would have been Patrick's duty to inform his partner of all that had taken place, he was under no obligation to do so if the contract were complete.   He might well be reluctant to give him information which would only lead to disputes and litigation.

In the view we have taken of this case, it becomes unnecessary to consider the conduct of Patrick after August 13th, in suppressing the information with regard to the discovery of the ore, or the question of laches which the defendant urges with so much earnestness.

The decree of the court below will, therefore, be

*Reversed, and the case remanded, with instructions to dismiss the bill.*

Mr. Justice Brewer, with whom concurred Mr. Chief Justice Fuller, dissenting.

I am unable to concur in the foregoing opinion.   Accepting the rule laid down in *Brooks* v. *Martin,* 2 Wall. 70, as con-

trolling, it is undisputed that no conveyance was made by Bowman to Patrick until October 19, 1892. It is undisputed that long before that Patrick knew of a large body of valuable mineral in the shaft, and that he did not communicate the fact of this discovery to Bowman. It is also not open to question that the property then conveyed was worth very much more than Bowman received. But it said that prior thereto there was a completed understanding that Patrick was to purchase Bowman's interest. What is meant by the term "completed understanding" is doubtful. If by it is meant that a binding contract had been entered into before October 19, I deny the fact. If only that Patrick knew the terms upon which Bowman was willing to sell, I deny that the law is that knowledge of such fact relieved Patrick from the obligation to make full disclosure up to the time of the actual purchase. It may be conceded that Bowman was willing to sell in consideration of the surrender of his note, and Patrick knew of this willingness, but can it be that knowledge by a resident partner that the non-resident partner is willing to sell at a fixed price releases him from the obligation of full disclosure, enables him to continue his explorations to discover the value of the property, and, when ore of large value is finally discovered, complete the purchase without disclosing that fact? I do not so understand the law. Until a definite contract has been entered into between the parties, binding alike on vendor and purchaser, and understood to be binding alike on both, the rule laid down in *Brooks* v. *Martin* compels the resident partner to make full disclosure. The question is not whether Bowman acted badly, but whether Patrick fully discharged the duties resting upon him as resident partner. If he says that before the purchase was actually made there was a completed contract which relieved him from his obligations of disclosure, must he not make it clear that such completed contract was in fact made? It is true, Bowman was willing to sell during June and July, providing he could get his note back; but this willingness to sell was based upon the facts as they then existed, or at least as known to him. The shaft had been sunk many feet, no mineral had been discovered, no indications of mineral dis-

closed.  He might well have said, I am ready to abandon this if you will only give me back my note; but can it be that this willingness to sell, communicated as it was to Patrick, will sustain a purchase in the succeeding October, after mineral had been discovered, the value of the property largely advanced, and without any disclosure of those facts to Bowman?

As the transactions between Patrick and Bowman, intermediate June 19 and October 19, were all by letter or telegram, there can be no dispute as to what took place.  It appears that Patrick wrote three letters after the interview of June 19 :- one June 22, another June 27, and a third June 28.   The first says this : " In regard to your interest in the ' Col. Sellers,' I think I know a man who will pay the note you gave me, $288.69, and take your interest off your hands. . . . If you are willing to let it go on these terms . . . please telegraph me immediately, and I will try and make the arrangement."   This letter did not reach Bowman until the 13th of July, when he telegraphed, " Yours of June 22 received yesterday ; proposition accepted; send note."   To which Patrick replied on July 15: " Acceptance too late ; proposition was dependent upon an immediate acceptance in St. Louis. See my letter of 5th."

How out of this a contract can be deduced I do not understand.   Patrick does not offer to purchase, does not say that he knows any one who will purchase, but simply asks Bowman if he is willing to sell at such a price, and promises, if so, to try and find a purchaser.   It was this letter only which Bowman had received at the time of his telegram, and only the proposition or suggestion contained in it which he by that telegram accepted.   It seems to me that it would puzzle a pleader to so frame a declaration as to show that that letter and acceptance created any contract between the parties.

Something is suggested as to an undisclosed principal, and it is said that the agent is bound when the principal is not.   I do not appreciate the pertinency of that suggestion, for there is in this letter no assertion of an undisclosed principal for whom the agent makes the proposition.   All that Patrick says is that if Bowman will consent to sell upon the terms

named he thinks he knows of some one who will buy, and will try to make the arrangement. It is true that on June 27, Patrick does say that there is a party who will take the property on those terms, and it may be said that here is an allegation of an undisclosed principal. But that letter had not then been received by Bowman, and nothing in it was covered by his acceptance of July 13. The acceptance specifically referred to the letter of June 22, which contained the only proposition or suggestion which Bowman then knew. Out of that I can torture no binding contract — no "completed understanding." On the 15th, two days after this telegram from Bowman, Patrick telegraphed: "Acceptance too late; proposition was dependent upon an immediate acceptance in St. Louis." In the face of this, can it be said that there was a binding contract or a completed understanding? Did Patrick, when he sent this telegram, understand that he had bought Bowman's interest, or was bound by any contract of purchase? I do not understand the force of the English language if it can fairly be said, in the face of such a telegram from the subsequent purchaser, that there was a completed understanding between the parties in respect to the sale. Patrick's declaration that the acceptance was too late was justifiable if he had been theretofore acting in good faith. His three letters in June were all directed to Bowman at St. Louis, although he knew that Bowman was going to spend the summer in Wisconsin, and had given his address, "Bayfield, Wisconsin." Directing to St. Louis, and calling for a telegram immediately, was a notification that that was not a continuing proposition, but one which must be received and acted on immediately. If it was not a proposition requiring haste he would naturally have addressed these letters to Bayfield, Wisconsin, the address given by Bowman, and in the vicinity of his summer outing in the woods. Sending to St. Louis was because he thought he might possibly reach him before he left for the summer, and thus have the question settled promptly, and so when he telegraphed on the 15th of July he could properly say: "Acceptance too late; proposition was dependent upon an immediate acceptance in St. Louis." It is unnecessary to

refer to the letter which Patrick claims to have written on July 5, as it is conceded that that letter was never received by Bowman. It is significant only, as indicating Patrick's state of mind, by these closing words: "I withdraw my offer to return your note of $288.70, dated June 19, 1882, in case you assign your interest in the contract to me."

Reliance is placed on Bowman's letter, in which he used the words "your proposition," but this it seems to me is trivial. The proposition or suggestion was one which did come in a letter from Patrick; and though Bowman does not write out in detail the full description of that proposition, but refers to it in the brief way he does, that cannot enlarge the scope or change the character of the proposition as it was sent in the letter by Patrick. That meant only that which it said; and when Bowman telegraphed an acceptance of that specific proposition, neither party was bound beyond the terms expressed. That made no binding contract of sale, and when Patrick, two days after Bowman's telegram, replied that the acceptance was too late, there was nothing concluded between the parties. That Patrick understood that there was nothing binding is further evidenced by the fact that before Bowman's telegram of July 13, and on July 5, he had received advice from his counsel that Bowman's interest could be obtained in another way, and without paying anything, and so in attempting to carry out the plan suggested by counsel he sent a letter to Bowman at the Merchants' Hotel in St. Paul, and drew a draft upon him at St. Paul for his supposed share of the expenses to date. To say that, while he was trying to obtain possession of Bowman's interest by proceedings of this character, there was a completed understanding between the parties for the purchase of that interest, is something I cannot understand. Evidently Patrick did not have the utmost reliance upon this plan suggested by his counsel, and although that draft was returned unpaid, yet as the indications of approaching mineral became clearer his desire to purchase from Bowman became stronger, and he concluded that the better way was to come back to the original proposition of purchase, and so, on August 2 he sent a

proposed contract.   Still, as at the date at which that contract was sent, it was not absolutely sure that mineral in paying quantities would be found in the mine; the contract which he sent to Bowman for his signature was simply a contract binding Bowman to sell, and not binding himself to buy.   Obviously he was not then sure that he would purchase.   He wanted to get an option from Bowman, something that would bind him to sell, and then sink the shaft a little further, and make some more developments before he bound himself to purchase.   And yet it is said that before this there was a completed understanding, a binding contract between these parties for the purchase of Bowman's interest.   Bowman, knowing nothing of the disclosures made by the sinking of the shaft, and not knowing that the indications of approaching mineral were stronger and clearer, was still willing to sell on the terms named, but was not willing to give an option to buy ; and so, on August 28, he prepared a contract binding both parties, and enclosed it in a letter to Patrick at Leadville, but before it had reached there Patrick had gone East. Nothing further took place until the day of the conveyance, October 19.

It is suggested that Bowman evidently regarded the matter as settled, leaving only the details to be arranged.   It seems to me the important question is not how Bowman, but how Patrick, regarded it. ᾿ Did he understand that the thing was settled between them ?   Certainly not, when he telegraphed that the acceptance was too late ; certainly not, when he sent a contract not for a purchase, but giving him an option to purchase, binding Bowman and not himself.

And in this respect, Patrick's testimony as to his understanding of the matter is significant.   On his direct examination he testified that the party he had in mind when he wrote the letter of June 22 was his own attorney in Leadville, Col. J. B. Bissell.   His testimony was in these words:

" It was Col. J. B. Bissell, and when I came up to Leadville I spoke to him in regard to it, and he declined to take it, and declined to take the interest and pay that note, and, as I told Bowman, I was carrying all I could ; so between the 22d of

June and that time I changed my mind, that is, between the 22d of June and July 5, in regard to it."

In reference to the advice given him by Col. Bissell, he testified:

"He said it was no use of paying that note or having anybody else buy it; when another assessment was due to draw on Bowman, and if he does not pay your draft promptly just apply to the owners of the Col. Sellers, that is, to Stebbins, Robinson, and others, for a new contract in your own name, leaving Bowman out, and when I wrote the letter of July 5 it was my intention to do that, and when I received Bowman's telegram of the 15th of July I so notified him in that telegram."

Further on in his deposition appears the following, also on direct examination:

"Q. When was your partnership with the plaintiff in the working of the Col. Sellers and Accident mining claims under the contract, Defendant's Exhibit 'A,' terminated?

A. It was terminated, as I regarded it, on the receipt of the plaintiff's letter of July 16, and by my acceptance of the proposition contained therein, and the forwarding of the contract which was prepared by C. C. Parsons."

And on cross-examination this appears:

"Q. You recognized it to be your duty as a partner, when you wrote a letter accepting what you call Bowman's proposition of July 16, 1882, to tell him what occurred before you wrote that letter, didn't you?

"A. I did not regard him as my partner after I received that letter of July 16; he had not paid.

"Q. Didn't you regard him as your partner up to the time that you mailed an answer to that letter?

"A. Yes; but I accepted his proposition and I thought that ended the partnership.

"Q. In your view when did your partnership with Bowman end; when you received his letter of July 16, 1882, or when you mailed your answer to it?

"A. Take the two together.

"Q. It can't be both. When did you conclude that Bow-

man was not your partner, and was not entitled to the information?

"A. When I accepted his proposition of July 16."

According, therefore, to his own testimony, Patrick understood that the partnership relation, with the obligations of disclosure, continued until he had accepted the proposition in Bowman's letter of the 16th of July. When he mentally accepted that proposition, he alone knows or can tell. What he did after that was, on the second day of August, to send to Bowman, for signature, an agreement giving him an option to purchase, which never was signed. The contract which Bowman did prepare, a contract binding both parties, and which Bowman signed and forwarded on August 28, was not signed and forwarded until after mineral had been in fact discovered, and was so signed and forwarded by Bowman in ignorance of that fact.

Were not the discoveries in the mine such as should have been disclosed? Let us see what there is in this record that does not depend upon the recollections of witnesses. On July 5, Patrick writes to his brother, saying: "The shaft in the Col. Sellers is looking very promising; for several feet the porphyry has been heavy iron-stained, and I have good reasons for thinking that we are near the contact. Acting on Col. Bissell's advice, I to-day write to Bowman telling him that if he did not pay up I would apply to the owners of the ground for a new contract in my own name, and leave him out. I don't suppose he will pay, but I will let you in on the new one on the same terms you are in the old." On July 30 this appeared in the Leadville *Herald:* "The Col. Sellers shaft, on Iron Hill, is now down about 215 feet. Some small streaks of ore have already been cut, one of them assaying nineteen ounces in silver. The sinking of the shaft is progressing rapidly, with the prospects that expected ore bodies will soon be cut." And Patrick was in Leadville at that time. On August 10, in the same paper, appeared this statement: "Late Tuesday night [which would be August 8, 1882] ore was encountered in the shaft of the Col. Sellers on Iron Hill, appearing first in one corner of the shaft. The ore is pyrites

in character, and is pronounced to be identical with that which was first cut in the A. Y. mine, which it adjoins. It is probable that it will be necessary to pass through several feet of it before the same class of ore which has enabled the A. Y. to make such shipments will be reached. The property is owned by W. F. Patrick, Charles Stebbins, George Simmons, John Livezey and others."

But we need not stop with this. On August 16 a contract was signed by Patrick and the original owners of the mine, in which it was recited that "a lode or vein is now by all believed to have been struck," and which provided for the delivery of the deed called for by the original contract, which deed was, in fact, delivered on August 31. We need not resort to the parol testimony, of which there is an abundance, but may rest upon this written contract to prove that within thirty-two days after Patrick had telegraphed that Bowman's acceptance was too late a vein of mineral had been discovered in this shaft, and that this discovery, known to Patrick, was made two months and three days at least before the deed was acquired from Bowman. Parol testimony tends to show that the discovery was made at a much earlier date. Did Patrick at this time understand that a purchase had been made? We have seen that this correspondence with Bowman does not show a binding contract, and we have noted his own version of the matter, but there is still other testimony very significant. A letter from his wife to his brother, the brother whose interest in the mine Bowman was carrying for a year, was produced, which is as follows:

"KNOXVILLE, *August* 21, 1882.

"Dear Jemmie: I have just received a letter from Will, in which he tells me I was mistaken about his securing B.'s interest in the Col. Sellers. He only had the written promise of it. The deed has not been delivered to him. In my letter to-day he tells me to caution all of our home folk not to mention the success of the prospect, and adds 'If you have said anything to home folk about the Col. S. caution them not to mention it whatever they do, for if it should get to St. L. and

to B.'s ears, it might cause me considerable trouble and expense to get him out of the contract. Please caution the family not to mention it until I get a deed from B.'

"I am sorry I have said anything about it, but as I have for pity's sake do not tell it, or if, like myself you have said anything to Fannie or Mr. McM., do write immediately and ask them to keep it secret, so much depends upon a rigid silence. As Will said, if Mr. Bowman hears it, he can cause him a great deal of trouble to say nothing of the expense. I feel dreadfully and I shall never again put myself in this position. I am going to the 'Quarry' early to-morrow to caution mother and father. Do help me to keep this business as quiet as possible. You see at a glance how much depends upon it. My sister is not so well to-day, although she is better than when I first came. With love, and an earnest request that you will burn this as soon as received, I am, hastily and truly,

"ANNIE."

And a letter of date August 28, from this same brother, James M. Patrick, to his wife, in which he says: "Willie has written to Annie (and she to me) telling her that there was an interest in the Col. Sellers which he wished to buy before the news of the strike got out, and wanted her and I to keep the matter quiet for a few weeks until he could get the deed." These letters show that it was known in the family that mineral had been discovered, and discovered long enough before August 21 for two or three letters to have passed between Knoxville and Leadville. Patrick had not, as shown by these letters, secured Bowman's interest. He had, it is true, received a letter from Bowman of July 16, in which the latter expressed his willingness to sell, said that he would not stand in his (Patrick's) way, and that if he (Patrick) wished any papers signed, to send them to him. In other words, he knew that Bowman was willing to sell, and had so expressed himself; he had not bought, and wanted the matter kept secret until the purchase was consummated.

Taking these letters in connection with the correspondence which passed between these parties and Patrick's own tes-

timony, it seems to me strange to say that there was a "completed understanding." It will not do to hold that, because Patrick had received Bowman's declaration of his willingness to sell—a declaration made in ignorance of any discovery of mineral—he, Patrick, could mentally accept Bowman's offer, and, without disclosing the fact that mineral had been discovered, proceed to secure a conveyance.

For these reasons I dissent from the opinion of the court, and I am authorized to say that the Chief Justice concurs in this dissent.

MR. JUSTICE FIELD did not sit in this case, and took no part in its decision.