**HUDSON et al. v. TEXAS GULF SULPHUR CO. et al.** *

No. 300.

Circuit Court of Appeals, Second Circuit.

July 16, 1934.

*Writ of certiorari denied 55 S. Ct. 209, 79 L. Ed. —.

Hornblower, Miller, Miller & Boston, of New York City (Nathan L. Miller, Harold H. Corbin, and Edward J. Bennett, all of New York City, of counsel), for appellants.

White & Case, of New York City (Joseph M. Hartfield, Lowell Wadmond, Richard T. Fleming, and Roy H. Callahan, all of New York City, of counsel), for appellees Texas Gulf Sulphur Co., Wing, and Doran.

Jacob J. Lesser, of New York City (Lawrence S. Lesser, Bertha Brantman, and Israel Belfer, all of New York City, of counsel), for appellee Snyder.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

Appellants, suing on the basis of fraud, seek to rescind transfers of their interest in sulphur lands in Matagorda county, Tex., made by them together with their associate in business, appellee Snyder, on December 31, 1918. The conveyances were made to appellee Wing, who in turn transferred the properties to the Texas Gulf Sulphur Company for whom he was acting as agent. Interests in these lands were conveyed directly to the Texas Gulf Sulphur Company by Wing. Minor interests were conveyed to Snyder and Doran. Appellant Hudson, a shipping man, a resident of Norfolk, Va., and Massman, a salesman, a resident of Louisiana, joined with the appellee Snyder, promoter of oil lands, in the acquisition of stock and financing of an oil company. They entered into an agreement, dated April 19, 1918, each obtaining a third interest. On April 27, 1918, Massman and Snyder in writing agreed to buy and sell mineral lands and leases, the profits to be divided equally between the two after repayment of advances made. On June 6, 1918, the three entered into another agreement dividing their interests. By an agreement of the same date, Massman was given a 90-day option to purchase a one-half interest in the various properties. The agreement stated that each had advanced $12,500 for the common benefit. While appellants and Snyder were acquiring properties in this section of the country, the appellee Texas Gulf Sulphur Company was actively and publicly developing its property nearby. There was some friction between the two groups.

One of the wells developed by the appellants showed some sulphur. On August 10, 1918, the three executed an agreement stating that Hudson had expended $15,000, Massman $55,000, and Snyder $2,000 in the venture, and agreed that, after repayment of said sums and payment of outstanding obligations, the profits were to be divided, Hudson 25 per cent., Massman 50 per cent., and Snyder 25 per cent. Negotiations for the sale of the property were then carried on in New York City with a corporation interested in sulphur, but without success. On August 23, 1918, an option until February 15, 1919, was given to the Lewisohn interests with conditions, which are unimportant here. Although some of the development work was carried on by these optionees, they did not exercise the option.

September 2, 1918, Snyder signed an agreement stating that all the properties taken in the name of Massman and Snyder were acquired solely with the moneys of Massman and legal and equitable title or titles were in the appellants. Snyder's interest was only in the "net profits derived from the use of said properties." After the payment of such moneys advanced, the interest of Snyder was to be determined by Massman.

Massman wrote letters telling of his lack of faith in the enterprise and his inability to advance more money and he urged Snyder to find a buyer for his interest. Massman gave an option to one Allen to purchase his interest for $27,500. He then gave Snyder an option on his interest for $65,500. The Phœnix Sulphur Co. sued in Texas and filed a lis pendens against the properties of Massman and Snyder which was settled by Snyder agreeing to pay $21,300 out of the proceeds to be received from the sale of the properties.

The appellants and Snyder came to New York, where appellants gave options to Snyder to purchase Hudson's interest for $41,500 and Massman's for $85,000. These sums would give each appellant a profit. The option agreements were prepared by appellants' attorney. Hudson's option provided for the sale of Hudson's interest for $41,500,

or, at his election $21,500 in cash and 5 per cent. of the stock of a corporation to be formed, but Massman's option provided for the sale of Massman's interest for $85,000. The options were binding until December 31, 1918. Contemporaneously with the execution of these options, the three signed a collateral agreement whereby, upon consummation of sales under the options, Massman assumed obligations payable to attorneys in Texas, and Hudson assumed another obligation.

It was stated by Hudson and Massman that, in discussions leading up to these options, Snyder said he was dealing with Wall Street gamblers and wanted something definite in order to enable him to proceed with the negotiations—thus the preparation and delivery of the options. However, evidence was offered showing that Hudson testified differently in a suit in Texas as to his motive in giving the options. They both testified that Snyder was to obtain as much as possible for the properties, and that any excess over and above the option figures would be divided 25 per cent. to Hudson, 50 per cent. to Massman, and 25 per cent. to Snyder. Snyder denied this, and stated that the options were given to him to secure a purchase of the interests of Hudson and Massman for the amounts specified.

On December 31 Snyder called at the office of the Texas Gulf Sulphur Company and offered its president a sale of the properties for $1,000,000. This was refused, but negotiations were carried on which led to Snyder meeting appellee Wing, who was the attorney for the Texas Gulf Sulphur Company. The president of the Texas Gulf Sulphur Company advised Snyder that Wing would carry on negotiations for the company. Snyder left the lawyer's office and returned later with Hudson and Massman, and in the presence of the three men, the options were read and discussed. Wing stated that he was acting for a principal whose name he was not at liberty to disclose. Wing said he noticed that one of the options called for cash, or cash and stock, but he declared that the transaction would have to be all cash. Wing stated that Hudson said he would take cash. Wing also said that he told the appellants that a separate agreement was being made with Snyder; that he was paying for interest of appellants and that they could consider the options exercised; that he would give certified checks for 10 per cent. of the amounts to be paid and his firm's checks for the balance. Hudson testified that he repeatedly said that he

did not want to sell for cash but desired to maintain his stock interest in a company organized to take over the properties but Snyder advised him to take cash because the persons to whom the properties were being sold were Wall Street gamblers and not to be trusted. He said Snyder reiterated many times that he was getting nothing but a job out of the transaction. This was contradicted by Snyder and Wing; the latter testifying that Hudson said he would take cash. Wing insisted upon a warranty of title free from incumbrances, and Hudson protested, whereupon Hudson's lawyer was called into conference. An acceptance exercising the options for the sale of the properties was agreed upon, and on January 2, 1919, the formal documents were signed wherein Massman and Hudson agreed to sell and assign to Wing all their right, title, and interest in the properties in question. Wing, by the instrument, assumed and agreed to pay the Sussman indebtedness of $20,233 and interest, and there was a covenant that payment would be made not later than January 2, 1919, and a release procured from Sussman. An indebtedness of $70,000 also was assumed. These obligations were met in due time.

Appellants cashed their checks and received their moneys. Massman went to Sussman's office where he talked with one Phelan. Phelan testified that according to Massman's report Snyder had received $85,000. The properties were subsequently conveyed by Wing to the Texas Gulf Sulphur Company, and the deeds were recorded in April, 1919, and July, 1920.

The corporation commenced construction work in the spring of 1918, and commercial sulphur was produced in March, 1919. While the enterprise was speculative still by good management and use of patented processes the sulphur extracted became a highly profitable product. The sulphur company has invested in the plant about $8,500,000.

In 1928, appellants say, was the first that they learned of the payment to Snyder, although six days after the transfer Hudson wrote to Snyder, "Joe, you are in good shape to make a big bit of money and be sure to hold on to a good lot interest for yourself, for I want to see you make good in this particular case." Litigation followed between Massman and Snyder in Texas to recover part of the money paid to Snyder. Hudson knew of this suit in June, 1928, and says it was at this time that he, for the first time, learned of the payment to Snyder. The suit in Texas was dismissed. Massman v. Snyder (D.

C.) 27 F.(2d) 542. During its pendency, Snyder held 40,000 shares of the Texas Gulf Sulphur Company stock. He is now without financial responsibility.

Upon these facts, the court below found that the appellants and Snyder, at the time of the sale of the formers' interests, were not joint adventurers, that the appellees were not in conspiracy, nor was fraud perpetrated by them and the sale of appellants' property was made with their full understanding and without any deceit having been practiced upon them. While the properties when purchased were speculative, they have been well developed, and large profits have been obtained by the sulphur company.

The court below had the advantage of seeing and hearing the witnesses, and gave credit to the testimony offered on behalf of the appellees. Snyder by agreement of September 2, 1918, had practically eliminated himself from financial gain, and in December, 1918, at the request of the appellants, he attempted to make a sale of the properties. The options were executed. They were exercised by the buyer for the considerations fixed by the appellants after considerable negotiations. Wing, whose testimony the court deemed worthy of belief, with which we agree, stated that he notified the optioners that he would exercise the option and would accept the offers therein contained, and they did accept the prices fixed in the option. Indeed, the options were drawn before they ever reached the sulphur company's office. That is not disputed.

■ The appellants were not in a fiduciary relationship with reference to the sale of the property after the delivery of the options on December 27, 1918, if indeed the fiduciary relations which did exist were not terminated on September 2, 1918. The options made no provisions for any sums to be paid other than those stated therein. No ambiguity exists as to the terms thereof, and parol evidence cannot vary them. Richardson v. Hardwick, 106 U. S. 252, 1 S. Ct. 213, 27 L. Ed. 145; Watkins Salt Co. v. Mulkey, 225 F. 739 (C. C. A. 2); Mitchill v. Lath, 247 N. Y. 377, 160 N. E. 646, 68 A. L. R. 239. The considerations named for the option on December 27, 1918, showed substantial profits for the appellants. By their terms, when accepted, obligations were created which were binding upon the appellants. Patrick v. Bowman, 149 U. S. 411, 13 S. Ct. 811, 37 L. Ed. 790.

Whatever may have been the fiduciary obligation between Snyder and the appellants when the appellants knowingly gave these options to Snyder, the interests were sold only after negotiations with appellants and with their approval. They have binding force and effect upon the appellants. There was no partnership after September 2, 1918, although Snyder did retain an interest in the profits that might possibly ensue.

■ The findings of fact of the experienced trial judge below should not lightly be set aside, where there is a conflict of evidence. We are satisfied that the proper result has been reached. The Boston Socony, 63 F. (2d) 246 (C. C. A. 2); Lowenstein v. Platt & Co., 58 F.(2d) 173 (C. C. A. 2); National Surety Co. v. Mass. Bonding & Ins. Co., 19 F.(2d) 448 (C. C. A. 2); De Laski & Thropp C. W. Tire Co. v. U. S. Tire Co., 235 F. 290 (C. C. A. 2).

■ This suit was started in the state Supreme Court and removed to the District Court, and a motion to remand was denied. There was a separable controversy stated as to the Texas Gulf Sulphur Company as set forth in the petition for removal. The suit was between it, a citizen of another state, and the appellants. The relief asked against it was that it be directed to return, convey, and assign to the appellants all the properties transferred under the agreement of December 31, 1918, and to account for all profits, incomes, and increments thereof and therefrom. The relief sought against Wing and Snyder was that they be directed to account for all profits, incomes, and increments derived by them from the alleged secret and fraudulent agreements between them and the appellee corporation. As to Wing and Doran, it was asked that they join in the execution of deeds, assignments, and other necessary documents to revest in appellants the titles and rights which they parted with by the contract of December 31, 1918. Such prayers for relief show a separable controversy as to the Texas Gulf Sulphur Company. None of the others are necessary parties to the action against the corporation, either for an accounting or for a reconveyance. The corporation holds title to the property. The suit was removable. Venner v. Southern Pac. Co., 279 F. 832 (C. C. A. 2).

Decree affirmed.