## NICKELL v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. February 3, 1908.)

No. 1,391.

1. CONSPIRACY—INDICTMENT.

Where an indictment for conspiracy to induce certain persons to commit perjury in the making. of public land entries alleged that the acts were knowingly done, and that defendants knew that the entrymen were applying to purchase the lands on speculation, and not in good faith, to appropriate the same to their exclusive use and benefit, the indictment was not fatally defective for failure in terms to allege that such acts were "willfully" committed under Rev. St. § 1025 (U. S. Comp. St. 1901, p. 720), providing that no indictment found or presented by a grand jury in any District or Circuit Court of the United States shall be deemed insufficient for any defect in matter of form not tending to defendant's prejudice.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, §§ 88; vol. 27, Indictment and Information, §§ 256–264.]

2. PERJURY—FALSE AFFIDAVITS.

Where an entryman on public lands signed and swore to an affidavit that he entered the land for his individual use and benefit, and not for speculation, when in fact, he intended to immediately transfer the land to another under a pre-existing contract, he thereby committed perjury as defined by Rev. St. § 5392 [U. S. Comp. St. 1901, p. 3653].

[Ed. Note.—For cases in point, see Cent. Dig. vol. 39, Perjury, § 23. For other definitions, see Words and Phrases, vol. 6, pp. 5305–5310; vol. 8, p. 7751.]

3. SAME—"SUBORNATION OF PERJURY."

Procuring entryman to make such false affidavits constituted subornation of perjury as defined by Rev. St. § 5393 [U. S. Comp. St. 1901, p. 3654].

[Ed. Note.—For other definitions, see Words and Phrases, vol. 7, p. 6720.]

4. SAME—VALIDITY OF CONTRACT.

Defendant and others conspired to defraud entrymen on public lands of the location fees, and, in order to induce them to enter the lands, M. represented to them that he was the agent of a fictitious corporation of whom a fictitious person was president, which corporation desired to purchase the land, and would do so from the entrymen, either for a specified amount, or in accordance with an estimate of timber thereon. Pursuant to such conspiracy, defendants induced the entrymen to sign and swear to entry affidavits declaring that the entrymen were purchasing the land for their own benefit, and not for speculation, and that they had no contract or agreement to transfer the same after they had contracted to convey the land to such corporation. Held that, since M. would have been personally liable on such contracts under the rule that one who holds himself out as an agent of a nonexisting principal is personally liable, the affidavits were in fact false and constituted perjury, though there was no intention on defendant's part at any time to carry them out or purchase the land.

5. SAME—AFFIDAVITS—STONE AND TIMBER ACT—LANDS AND TIMBER.

Under Stone and Timber Act (Act June 3, 1788, c. 151, § 1, 20 Stat. 89 [U. S. Comp. St. 1901, p. 1545]), making such lands subject to entry as are available chiefly for timber but unfit for cultivation, an entryman having made an affidavit that he sought to purchase the land for his own benefit and not for speculation could not escape punishment for conspiracy on the ground that his pre-existing contract of sale related to the timber only.

In Error to the Circuit Court of the United States for the District of Oregon.

The plaintiff in error, Nickell, was indicted jointly with Henry W. Miller, Frank E. Kincart, and Martin G. Hoge in the Circuit Court for the District of Oregon for conspiracy under section 5440 of the Revised Statutes (U. S. Comp. St. 1901, p. 3676). That part of the indictment material to the present inquiry reads as follows: "The grand jurors for the United States of America, inquiring for the district of Oregon, upon their oath present that Henry W. Miller, Frank E. Kincart, Martin G. Hoge, and Charles Nickell, late of the city of Medford, in the district aforesaid, on the thirty-first day of August, in the year of our Lord nineteen hundred and four, at Medford aforesaid, in the said district, unlawfully did conspire, combine, confederate, and agree together, and with divers other persons to the said grand jurors unknown, to commit an offense against the said United States; that is to say, to unlawfully, willfully, and corruptly suborn, instigate, and procure a large number, to wit, one hundred, other persons to commit the offense of perjury in the said district by taking their oaths there, respectively, before competent tribunals, officers, and persons, in cases in which a law of the said United States should authorize an oath to be administered, that they would declare and depose truly that certain declarations and depositions by them to be subscribed were true, and by thereupon, contrary to such oaths, stating and subscribing material matters contained in such declarations and depositions which they should not believe to be true; that is to say, to suborn, instigate, and procure the said persons, respectively, to come in person before such tribunals, officers, and persons, and, after being duly sworn by and before such tribunals, officers, and persons, to state and subscribe under their oaths that certain public lands of the said United States open to entry and purchase under the acts of Congress approved June 3, 1878, and August 4, 1892, and known as 'timber and stone lands,' which those persons would then be applying to enter and purchase in the manner provided by law, were not being purchased by them on speculation, but were being purchased in good faith to be appropriated to the own exclusive use and benefit of those persons, respectively, and that they have not directly or indirectly made any agreement or contract in any way or manner with any other person or persons whomsoever by which the titles which they may acquire from the said United States in such lands shall inure in whole or in part to the benefit of any person except themselves, when in truth and in fact, as each of the said persons would then well know, and as they the said Henry W. Miller, Frank E. Kincart, Martin G. Hoge, and Charles Nickell would then well know, such persons would be applying to purchase such lands on speculation, and not in good faith to appropriate such lands to their own exclusive use and benefit respectively, and would have made agreements and contracts with other persons by which the titles which they should acquire from the said United States in such lands would inure to the benefit of persons except themselves; the matters so to be stated, subscribed, and sworn by the said persons being material matters under the circumstances, and matters which the said persons so to be suborned, instigated, and procured would not believe to be true, and the said tribunals, officers and persons when administering such oaths to those persons, being tribunals, officers, and persons authorized by law of the said United States to administer the same oaths, and the said oaths administered in cases where a law of the said United States would then authorize an oath to be administered." The defendant Miller pleaded guilty, and became a witness for the prosecution. A trial resulted in the conviction of Nickell and Hoge. Nickell was sentenced, and brings the cause to this court upon writ of error.

The transaction disclosed by the bill of exceptions follows: Plaintiff in error was a United States commissioner residing at Medford, Or. Miller and Kincart entered into an agreement between themselves to locate stone and timber claims, and to induce persons to file upon the same. Kincart was to act, and did act, as cruiser, and Miller was to represent himself as the agent of a company to be known as the "Emmitsburg of New Zealand." For the purpose of inducing persons to make filings, Miller was to tell prospective entrymen that this company desired to secure timber lands in southern Oregon;

that, if they would file on claims, the company would at the time of final proof furnish the money required for entry, and would, upon the procurement of the receiver's receipt and the assignment of it, together with a quitclaim deed, pay the respective entrymen the difference between the amount which they had advanced and the aggregate value of the claims, to be arrived at upin the basis of 40 cents per 1,000 feet for timber standing upon such lands. It fully appeared that there was no such company; that the name was assumed; and that one Wilson, represented by Miller as the head of the concern, was a fictitious person, as nonexistent as the company itself. The location fee was fixed at $125 per claim. Thus the matter stood when Miller and Kincart came to the plaintiff in error Nickell for the purpose of enlisting his aid in carrying on the enterprise. Miller explained that he and Kincart were there to locate persons on timber claims, and that he, Miller, was the representative of a company that would buy the lands after final proof had been made. At this point certain negotiations were had regarding the fees of Nickell as commissioner, and concerning the charge to be made for the publication of the necessary notices in a newspaper owned by him. It was agreed that the commissioner was to have $1.50 as fees, and, of the $10 fixed for the publication of notices, $2.50 thereof in every case was to be paid to Miller and Kincart. At this period of the negotiations it was concluded, also, that it was impracticable to secure so large a location fee, and the amount was cut down to $60 under the agreement that the balance was to be paid when final proof was made. Subsequently certain entrymen were charged only $25. The location fees were divided between Miller and Kincart. These two brought with them a blank which was to be used in contracting with entrymen, of which the following is a copy:

"Emmitsburg of New Zealand Certificate.

"Know all men by these presents that we, the Emmitsburg, of New Zealand, desiring to acquire timber and stone lands in southern Oregon, and ——— desiring to exhaust his right and dispose of said land at the time of final proof:

"Now, therefore, the Emmitsburg of New Zealand, agrees with ——— as follows, to wit:

"That said ——— locate the ——— quarter of section ——— township ——— south, range ——— west, Willamette Meridian, and at day of final proof on said land, we, the Emmitsburg, of New Zealand, will furnish four hundred dollars and take said ——— note, and upon the receiver issuing a certificate for said land, and its being assigned to the Emmitsburg, of New Zealand, or its agent, together with a quitclaim deed, we, the Emmitsburg, of New Zealand, will pay said ——— eight hundred dollars in addition to money heretofore paid. This agreement to be signed by the ——— and countersigned by company's agent or representative and deposited in escrow with ——— until day of final proof.

"In witness whereof we hereunto set our hands this the ——— day of ———, A. D. 1902.

"———————————————, Locator.
"Emmitsburg of New Zealand,
"Per ———————, Representative."

It was proposed by Miller to modify this contract, and for that purpose it was submitted to Nickell, who carried on a job printing office in connection with his newspaper. Accordingly blank forms were printed in his establishment which omitted these words in the first blank form, "Will pay said ——— eight hundred dollars in addition to money heretofore paid," and, in lieu thereof, these were inserted after the description: "Which is estimated at ——— million feet merchantable timber," and "will pay said ——— in all not to exceed forty cents per thousand, per estimate." Plaintiff in error expressed his doubts as to the feasibility of the project which had been devised by Kincart and Miller, and to which he had thus become a party, basing his doubts upon the fact, as he expressed it, that the same scheme had been worked in that community before. In order to arouse the cupidity of persons who had filings in contemplation, Miller informed them that no locations would be

made for those not desiring to dispose of the land, and the reason assigned by him at the trial for making this statement was that it would make them "bite a little better." He also testified: "As a matter of fact, we did not intend to buy the timber at final proof, or at all. We had no money to buy with." Numerous applications and affidavits were made pursuant to this arrangement before the plaintiff in error as commissioner, and forwarded by him to the land office, where they were duly filed and entered of record, and these contracts, either the original or as modified, were executed by the several entrymen immediately thereafter. They were retained by Miller, and at once destroyed by him, but none of the persons who filed ever made or offered to make final entry.

The trial court instructed the jury in part as follows: "I repeat, an agreement, as the word 'agreement' is used, need not be in writing. It need not be of sufficient formality or of a nature to be enforced in a court. It is enough if it is proved beyond a reasonable doubt that in some way the minds of the applicant and some other person have met definitely, understandingly, and that there is a mutual consent upon the point that, when the applicant may acquire title to the land from the United States, it shall inure to the benefit of such other person for a consideration; that is, that in truth and in fact, the applicant is really to acquire the land for the use and benefit of another. And any words or any acts and words manifesting this mutual consent of the minds of the parties are sufficient to constitute a contract or agreement. * * * If the agreement to convey exists and is understood between the parties, the law does not tolerate evasion by calling such an agreement a 'certificate' or 'option.' Nor, if the agreement actually exists, can the law be evaded by an endeavor to separate title to the timber upon the land from title to the land itself. On the other hand, a person qualified under the law has a right to enter lands under the provisions of the timber and stone act, even though he considers prior to the time of making his sworn statement and his final proof a sale of it as soon as he can after he makes his final proof, and obtains the usual receiver's receipt. * * * But the statute does denounce a prior agreement, the acting for another in the purchase from the government of the United States. * * * You, and you alone, must ascertain whether the evidence shows beyond a reasonable doubt that Hoge and Nickell, or either of them, knowingly and intentionally entered into an agreement, or knowingly formed a part of a combination with Kincart and Miller, or either of them, to induce or procure persons to apply to enter and purchase public lands as alleged, or some part of the public lands as charged in the indictment as lands subject to entry under the timber and stone act, after having come to an agreement or understanding with said persons that they would convey the title which they might acquire to Miller, or the Emmitsburg of New Zealand, or some one represented by Miller."

Thomas O'Day, for plaintiff in error.

William C. Bristol and Francis J. Heney, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and WHITSON, District Judge.

WHITSON, District Judge (after stating the facts as above). While the plaintiff in error has made numerous assignments, they either directly present or incidentally involve two principal propositions: First. The sufficiency of the indictment. Second. The nature and character of the contract or agreement which is inhibited by the statute, and whether plaintiff in error was brought within its provisions.

First, then, as to the indictment: The argument is that the pleader has omitted to charge that the acts complained of were willfully done. This is based upon the assumption, rightly made, that it must so appear by appropriate averment. Assuming for the present discussion

161 F.—45

without holding that the words "unlawfully, willfully, and corruptly" first appearing in the indictment cannot relate to the subsequent allegations in relation to the nature of the oaths taken for want of explicit reference, it does appear that the acts were knowingly done, for it is alleged:

"When, in truth and in fact, as each of the said persons would then well know, and as they, the said Henry W. Miller, Frank E. Kincart, Martin G. Hoge, and Charles Nickell, would then well, know, such persons would be applying to purchase such lands on speculation, and not in good faith to appropriate such lands to their own exclusive use and benefit, respectively, and would have made agreements and contracts with other persons by which the titles which they should acquire from the said United States in such lands would inure to the benefit of persons except themselves."

We think the distinction which counsel makes is a technical refinement which cannot prevail under the liberal provisions of section 1025 of the Revised Statutes (U. S. Comp. St. 1901, p. 720). If the defendants knew that these affidavits would be false, and knew that the entrymen would have made contracts for the conveyance of the lands to be acquired by them, and having this knowledge nevertheless procured the making of them, there can be but one conclusion, and that is that they willfully, which is but another name for intentionally, entered into the conspiracy charged. While matters of substance are as essential now as before the passage of the statute, and of necessity must always remain so, we take it that its enactment was intended to have substantially the same effect as those of many of the states, which provide that an indictment which will enable a person of common understanding to know what is intended is sufficient.

In Van Gesner v. United States, 153 Fed. 54, 82 C. C. A. 188, it was observed by this court:

"When the facts alleged necessarily import such willfulness, the failure to use the word itself is not fatal. Such failure, under such circumstances, would not be fatal even at common law."

The indictment in this case falls within the rule there discussed.

The second point presents a question of more difficulty. Section 2 of the act of June 3, 1878 (20 Stat. 89, c. 151 [U. S. Comp. St. 1901, p. 1545]), requires the entryman at the time of making his application to make oath that he has not made any agreement or contract in any way or manner, directly or indirectly, with any person or persons, by which the title shall inure to the benefit of any person except himself. That it was intended to meet the evasions which would be resorted to from time to time is quite manifest. Schemes, devices, and subterfuges which ingenuity could invent, and of which this case furnishes a striking example, were in view equally with formal contracts. We are precluded from holding otherwise by the comprehensive language of the statute; and to sustain the contention of plaintiff in error in that regard would be equivalent to saying that its purpose can be entirely defeated by secret understandings and ingenious circumventions. Boren v. United States, 144 Fed. 801, 804, 75 C. C. A. 531. With this construction in mind, the particular scheme which was conceived in this case will be examined. The certificates,

so called, were, of course, devices. Miller objected to giving the name of the responsible head of his company to one of the prospective entrymen, but, on being pressed, he did give a name, concerning which he testified as follows:

"I gave him the name of J. D. Wilson, of Minneapolis, Minn., as the head man. That was the first name that happened to come to my mind. He had nothing to do with the company. I do not know that there was any such individual."

Again he testified:

"I represented no company at that time. The company was only on paper. It was a name assumed for the purpose of carrying out our scheme."

The case must therefore rest upon the undisputed fact that there was no such company as the Emmitsburg of New Zealand. That company was fictitious, and Wilson as its manager had no existence. There was, then, no contract or agreement with any person to convey, or whereby the land might inure in whole or in part to the benefit of such company. It was not the purpose to supply money with which to make the entries nor to acquire title. The scheme was to work the entrymen out of the location fees; to defraud them. Here the matter was to end, and did end. But the entrymen and the defendants, other than the plaintiff in error, and he, giving due effect to the verdict of the jury, thought there was a contract to convey, and therefore it is that in this regard the affidavits contained averments which the entrymen did not believe to be true. This was perjury. Section 5392, Rev. St. (U. S. Comp. St. 1901, p. 3653). Procuring the making of such affidavits was subornation of perjury. Section 5393, Rev. St. (U. S. Comp. St. 1901, p. 3654). The case was submitted to the jury upon the theory that it might find from the evidence agreements as charged in the indictment by which the lands to be acquired were to be conveyed, or might inure to the benefit of some person other than the entrymen. Miller, Kincart, and the plaintiff in error intended that the false affidavits should be made, and the plaintiff in error supposed that there were agreements in fact as well as in form that the lands were to be entered and conveyed to Miller's company. In addition to the certificates which were signed, there was evidence to establish that, at least as to some of the entrymen, there were oral agreements made with Miller to convey to this company; but, bearing in mind that the entrymen intended to defraud the government of these lands, and that the plaintiff in error intended to, and did give his aid to what he supposed was a deliberate attempt to do so, the case must turn upon whether there were agreements or such an arrangement as would result in the lands inuring to the benefit of some person other than the persons who were making entries of them. If these agreements had been made by Miller concerning lands which might properly be the subject of contract, he could have been held personally responsible. They would have been enforceable as against him under the rule that one who holds himself out as the agent of a principal who has no existence is personally liable. Patrick v. Bowman, 149 U. S. 121, 13 Sup. Ct. 866, 37 L. Ed. 790; Paine v. Loeb, 96 Fed. 167, 37 C. C. A. 431; Second Kent's Commentaries, 630;

Booth v. Wonderly, 36 N. J. Law, 250; Story on Agency, § 230, 280, 281.'

Remembering, now, the comprehensive provisions of the statute as prohibiting all manner of devices, we find that the agreement was with Miller, and not with his company, and while he, as he says, did not intend to comply on his part, yet the vice prohibited is the making of it, and the conspiracy charged is having suborned these entrymen to swear falsely that no such agreement was made when in fact it was. The charge assumed that there might have been a contract to convey to the Emmitsburg of New Zealand, it is true, but the jury could not have been thereby misled, for, if an agreement with Miller would have bound him personally under such conditions, the lawful conditions of a contract being present, it would make no difference whether the contract was made with Miller's company or with him. There was nothing in the evidence which in any way could tend to confuse the jury. There was in this regard but one transaction, and the mere presentation of the case upon the theory that there may have been a contract made with the Emmitsburg of New Zealand was accompanied also by the assumption that the jury might from the evidence find that the contracts were with Miller, and, inasmuch as there was nothing else before the jury except this transaction, there could have been no prejudice.

The conclusion reached by the jury was correct, even though it may not have been told in so many words that Miller would be responsible if his company had no actual existence. This it appears the court assumed as a proposition of law without explaining it to the jury. It could not have in any way influenced the verdict. It was not like submitting two distinct transactions, from which different results might flow, for the consideration of the jury, leaving them to find the one or the other according to their judgment of the evidence.

The plaintiff in error relies upon the position that whatever arrangement was made related to the timber upon the land, and not to the land itself. Section 1 of the act makes such lands subject to entry as are "valuable chiefly for timber, but unfit for cultivation." It would be contrary to the spirit of this legislation to declare that an entryman may contract to sell that which gives the land its only value, and thereby escape punishment under so technical a contention. The timber is a part of the land, and one who thus seeks to avoid the plain spirit and even letter of the law cannot complain of penalties inflicted. Besides, the conspiracy here was to acquire the lands.

Finding no prejudicial error in the record, the judgment will be affirmed.