NICKELL v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. February 1, 1909.)

No. 1,391.

CONSPIRACY (§ 48*)—TRIAL FOR CRIMINAL OFFENSE—INSTRUCTIONS.

The instructions given on the trial of an indictment for conspiracy to induce perjury on the part of persons applying to enter land under the timber and stone act (Act June 3, 1878, c. 151, 20 Stat. 89, as amended by Act Aug. 4, 1892, c. 375, 27 Stat. 348 [U. S. Comp. St. 1901, p. 1545]) by

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

falsely stating that the lands were not being purchased by them on specu-
lation and that they had not made any agreement by which the titles they
might acquire should inure to the benefit of any other person, considered,
and, as applied to the evidence, *held* correct, as confining the inquiry to
the preliminary statements made at the time of the applications.

[Ed. Note.—For other cases, see Conspiracy, Dec. Dig. § 48.*]

Ross, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the District
of Oregon.

On rehearing. For former opinion, see 161 Fed. 702, 88 C. C. A.
562.

Martin L. Pipes and Thomas O'Day, for plaintiff in error.

Francis J. Heney, Tracy C. Becker, and John McCourt, U. S. Atty.,
for the United States.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge. This case was heard at a previous term
of this court, and a decision rendered February 3, 1908. The case is
reported in 161 Fed. 702, 88 C. C. A. 562, where the facts are fully
stated. On January 6, 1908, the Supreme Court of the United States
rendered a decision in the case of Williamson v. United States, 207 U.
S. 425, 28 Sup. Ct. 163, 52 L. Ed. 278, reversing the judgment of the
lower court, and remanding the case for a new trial for errors of the
trial court in admitting certain testimony and instructing the jury upon
the law. The plaintiff in error thereupon filed a petition for a rehear-
ing in the present case, alleging that in the case in the Supreme Court
Williamson was charged with identically the same offense as the plain-
tiff in error in this case, and that the law in that case is applicable to
the facts in this case. The rehearing was granted, and the case has
been considered in the light of the decision of the Supreme Court in the
Williamson Case.

The charge in the indictment in the Williamson Case, as in the indict-
ment now before the court in the present case, is, in substance, that the
defendants had entered into an unlawful conspiracy, combination, and
confederation on a date and at a place named, within the district where
the indictment was found, to commit an offense against the United
States; that is to say, to unlawfully, willfully, and corruptly suborn,
instigate, and procure a large number of persons to commit the offense
of perjury in the said district by taking their oaths before an officer, in
cases where a law of the United States should authorize an oath to be
administered, that they would declare and depose truly that certain
declarations by them to be subscribed were true, and by thereupon, con-
trary to such oaths, stating and subscribing material matters contained
in such declarations and depositions which they should not believe to
be true; that is to say, to suborn, instigate, and procure the said per-
sons respectively to come in person before such officer, and, after being
duly sworn by and before such officer, to state and subscribe under
their oaths that certain public lands of the said United States open to
entry and purchase under the acts of Congress approved June 3, 1878,

and August 4, 1892 (Act June 3, 1878, c. 151, 20 Stat. 89; Act Aug. 4, 1892, c. 375, 27 Stat. 348 [U. S. Comp. St. 1901, p. 1545]), and known as timber and stone lands, which those persons would then be applying to enter and purchase in the manner required by law, were not being purchased by them on speculation, but were being purchased in good faith to the own and exclusive benefit of those persons respectively, and that they had not directly or indirectly made any agreement or contract, in any way or manner, with any other person or persons whomsoever, by which the titles which they might acquire from the said United States should inure in whole or in part to the benefit of any person except themselves, when in truth and in fact, as each of the said persons would then well know, and as they, the said defendants, would then well know, such persons would be applying to purchase such lands on speculation, and not in good faith to appropriate such lands to their own exclusive use and benefit respectively, and they would have made agreements and contracts with other persons by which the titles which they would acquire from the said United States in such lands would inure to the benefit of persons except themselves; the matters so to be stated, subscribed, and sworn by the said persons being material matters under the circumstances, and matters which the said persons so to be suborned, instigated, and procured would not believe to be true.

It was provided in section 2 of the timber and stone act of June 3, 1878, c. 151, 20 Stat. 89 (U. S. Comp. St. 1901, p. 1545), referred to in the indictment:

"That any person desiring to avail himself of the provisions of this act shall file with the register of the proper district a written statement in duplicate, one of which is to be transmitted to the General Land Office, designating by legal subdivisions the particular tract of land he desires to purchase, setting forth that the same is unfit for cultivation, and valuable chiefly for its timber or stone; that it is uninhabited; contains no mining or other improvements, except for ditch or canal purposes, where any such do exist, save such as were made by or belong to the applicant, nor, as deponent verily believes, any valuable deposit of gold, silver, cinnabar, copper, or coal; that deponent has made no other application under this act; that he does not apply to purchase the same on speculation, but in good faith to appropriate it to his own exclusive use and benefit; and that he has not, directly or indirectly, made any agreement or contract, in any way or manner, with any person or persons whatsoever, by which the title which he might acquire from the government of the United States should inure, in whole or in part, to the benefit of any person except himself; which statement must be verified by the oath of the applicant before the register or the receiver of the land office within the district where the land is situated; and if any person taking such oath shall swear falsely in the premises, he shall be subject to all the pains and penalties of perjury, and shall forfeit the money which he may have paid for said land, and all right and title to the same; and any grant or conveyance which he may have made, except in the hands of bona fide purchasers, shall be null and void."

In section 3 it was provided:

"That upon the filing of said statement, as provided in the second section of this act, the register of the land office shall post a notice of such application, embracing a description of the land by legal subdivisions, in his office, for a period of sixty days, and shall furnish the applicant a copy of the same for publication, at the expense of such applicant, in a newspaper published nearest the location of the premises, for a like period of time; and after the expiration of said sixty days, if no adverse claim shall have been filed, the person desiring

to purchase shall furnish to the register of the land office satisfactory evidence, first, that said notice of the application prepared by the register as aforesaid was duly published in a newspaper as herein required; secondly, that the land is of the character contemplated in this act, unoccupied and without improvements, other than those excepted, either mining or agricultural, and that it apparently contains no valuable deposits of gold, silver, cinnabar, copper, or coal; and upon payment to the proper officer of the purchase money of said land, together with the fees of the register and the receiver as provided for in case of mining claims in the twelfth section of the act approved May 10th, 1872, the applicant may be permitted to enter said tract, and, on the transmission to the General Land Office of the papers and testimony in the case, a patent shall be issued thereon.  *  *  *  Effect shall be given to the foregoing provisions of this act by regulations to be prescribed by the Commissioner of the General Land Office."

To give effect to the provisions of this act by regulations as provided in section 3, the Commissioner of the General Land Office incorporated in a circular issued July 11, 1899, instructions showing the manner of proceeding to obtain title to public lands under the homestead, desert land, and other laws, and in section 11 of the circular it was prescribed as follows:

"The evidence to be furnished to the satisfaction of the register and receiver at the time of entry, as required by the third section of the act, must be taken before the register and receiver, and will consist of the testimony of claimant, corroborated by the testimony of two disinterested witnesses. The testimony will be reduced to writing by the register and receiver upon the blanks provided for the purpose, after verbally propounding the questions set forth in the printed forms. The accuracy of the affiant's information and the bona fides of the entry must be tested by close and sufficient oral examination. The register and receiver will especially direct such examination to ascertain whether the entry is made in good faith for the appropriation of the land for the entryman's own use and not for sale or speculation, and whether he has conveyed the land or his right thereto, or agreed to make any such conveyance, or whether he has, directly or indirectly, entered into any contract or agreement, in any manner, with any person or persons whomsoever, by which the title that may be acquired by the entry shall inure, in whole or in part, to the benefit of any person or persons, except himself. They will certify to the fact of such oral examination, its sufficiency, and his satisfaction therewith."

In the Williamson Case the Supreme Court held:

"That the particular false swearing to which the indictment related was alone the verified written statement provided for in section 2 of the act to be made on applying to purchase the land, and that the indictment did not embrace a charge concerning a statement or deposition under oath required to be made by the regulation of the Commissioner of the General Land Office, after the publication of the notice, and when the period had arrived for final action by the land office on the application to purchase."

The trial court had admitted evidence of the making of the final proofs, as provided in section 3 of the act of June 3, 1878, and section 11 of the circular of the Commissioner of the General Land Office. These final proofs embraced sworn statements made pursuant to the requirements of the regulations adopted by the Commissioner of the General Land Office, declaring the bona fides of the applicant, and that at that period he had made no contract or agreement to dispose of the land.

The trial court had also instructed the jury that the indictment covered perjury in the matter of final proofs, and that they might convict if satisfied by the evidence beyond a reasonable doubt that the de-

fendants intended that the persons who might be procured or induced to make entries of lands should willfully and deliberately commit perjury in particulars stated at the time of making their depositions, or sworn statements, when they made their final proofs before the United States commissioner, and in effect charged that a sworn statement made at the time of final proof concerning the purpose for which the land was sought to be purchased, etc., would constitute perjury, if the oath so taken, although not expressly embraced in the statute, was required by the regulations of the Commissioner of the General Land Office, because such regulations had the force and effect of law.

The Supreme Court held that an entryman who had made his preliminary sworn statement concerning the bona fides of his application and the absence of any contract or agreement by which the title which he might acquire from the United States would inure to the benefit of any person except himself is not required to make an additional oath to such facts on final proof, and a regulation of the Commissioner of the General Land Office exacting such additional sworn statement at the time of the final hearing is invalid. The court was accordingly of the opinion that error was committed by the trial court in admitting the final proof as evidence tending to show the alleged illegal purpose in the primary application for the purchase of the land, and that error was also committed in instructing the jury that the evidence covered, or could cover, the procurement of perjury in connection with the final proof, and that the jury might base a conviction thereon.

The indictment in the present case charges Henry W. Miller, Frank E. Kincart, Martin C. Hoge, and plaintiff in error, Charles Nickell, with a conspiracy to suborn a large number of persons to commit the crime of perjury in the entry of timber lands. As before stated, the offense charged is, in substance, the same as in the Williamson Case. The defendants Miller and Kincart pleaded guilty. The defendant Hoge and the plaintiff in error pleaded not guilty, and were tried and convicted. The facts in some important particulars differ materially from the facts in the Williamson Case, and it is with respect to such differences that the questions upon this rehearing are to be considered.

No final proofs were made, and no testimony was introduced tending in any way to show or to give the jury the impression that final proofs had been made by the entrymen in this case. The scheme of the entrymen, Miller and Kincart. was to find a large number of persons to make entries on timber lands in Southern Oregon, and induce such people to pay them large locating fees in cash, which were fixed at first at $125 each. Subsequently, it was agreed that the fees should be $60, and the balance to be paid when the entrymen made final proof; later the locating fee was reduced to $25 each, the balance to be paid upon final proof. These fees were to be divided between Miller and Kincart. The defendant, Nickell, was United States commissioner at Medford, Or., and the proprietor of two newspapers—one at Medford, and the other at Jacksonville. The sworn statements of the entrymen required by the act of June 3, 1878, were to be taken before him, and the notice of the application advertised in his Jacksonville paper. His fee as commissioner was $2.50 for each sworn statement, and $10 for advertising each notice of application. These

charges were to be paid by the entrymen. Miller and Kincart applied to Nickell to secure part of the advertising charge. They first wanted $4 out of each notice, but it was subsequently agreed that they should receive $2.50. Under this agreement, Nickell testified that 50 or 60 sworn statements were taken before him, and about 40 notices published in his paper. To induce the entrymen to pay the location fees, Kincart was to act as timber "cruiser"—that is to say, he was to select the lands for their timber value—and Miller represented himself as the agent of a company which would furnish the money required to make the entry of the land, and upon the assignment by the entrymen of the receiver's receipt and the execution of a quitclaim deed the company would pay the entrymen for the land upon the basis of 40 cents for 1,000 feet for the timber standing upon such lands. The entrymen agreed to make, and did make, preliminary proofs before the plaintiff in error as United States commissioner, pursuant to this verbal agreement; and there is evidence tending to show that the plaintiff in error knew of this verbal agreement at the time he took the preliminary proofs, and promoted the scheme.

This agreement was the inducement to make the preliminary proofs. It was the moving cause that brought them before the commissioner to take the required oath for such lands, and, notwithstanding, each entryman declared under oath before the commissioner that he had not, directly or indirectly, made any agreement or contract, in any way or manner, with any person or persons whatsoever by which the title which he might acquire from the United States should inure, in whole or in part, to the benefit of any person except himself. This was precisely what he had done, and constituted the perjury which the defendants are charged in the indictment with having conspired to procure the entryman to commit..

But it appears that Miller and Kincart had a blank form of a printed agreement (Exhibit No. 1), which it was proposed to have modified. This form of agreement, modified as proposed (Exhibit No. 2), was taken to Nickell, who carried on a job printing office in connection with his newspapers, and these blank agreements were printed in his office for use with the entrymen. This agreement (Exhibit No. 2), executed by the entryman, and by Miller for a company which he claimed to represent (the Emmetsburg of New Zealand), purported to obligate the company to pay to the entryman 40 cents per thousand fee for the timber on a described quarter section of land for which the entryman was to use his right of entry, and upon final proof he was to convey the land to the company, and also assign the receiver's certificate and execute a quitclaim deed. This form of agreement was executed by the entrymen, and by Miller for the company he claimed to represent, and was introduced in evidence without objection. It was, however, not open to objection. It was executed by the entrymen immediately after making the preliminary proof, and was a part of the transaction. It was an admission in writing that prior to the preliminary proof the entrymen had made the verbal agreement to convey the land upon making final proof and stated the terms of the agreement.

But it is assigned as error that the court instructed the jury in effect that this assignment was illegal in itself, and forbidden by stat-

ute; and that the plaintiff in error, having knowledge of this agreement and acquiescing therein, would become a member of the conspiracy, even though he had no knowledge of any previous oral agreement between Miller and Kincart and the entrymen. It is this general feature of the court's instructions that plaintiff in error contends is contrary to the law of the Williamson Case; but we find no such instructions in the record, and none from which such an inference could properly be drawn. In considering the court's instructions, it must be remembered that no final proof was made in any case. The transaction with the government consisted in making the preliminary proof, and that alone, and the question for the jury to determine was whether, when this preliminary proof was being made, the entrymen at that time had made an agreement or contract, in any way or manner, with any person or persons whatsoever, by which the title he might acquire from the United States should inure, in whole or in part, to the benefit of any person except himself. Manifestly, the written agreement described as "Exhibit No. 2," executed immediately after the preliminary proof had been made, could have no bearing in the case except to show that the preliminary proof had been made in pursuance to an agreement, the terms of which the entryman admitted were contained in Exhibit No. 2. This was clearly stated to the jury by the court in one of its instructions, defining the word "agreement." The court said:

"An agreement, as the word 'agreement' is used, need not, however, be in writing: it need not be of sufficient formality or of a nature to be enforced in a court of law.

"I refer to that, gentlemen, because in this case the question of whether or not Government's Exhibit No. 1 or 2, labeled 'Certificate' in the Emmetsburg of New Zealand, is to be considered by you, not as to whether or not it is an agreement or contract that could be enforced in a court of law—that is not material—but it is material that you determine whether or not there was, as I have defined and am defining it, an agreement or understanding had between the parties, in respect to the conveyance of the land, that the applicant was about to make his sworn statement to enter."

In other words, what consideration were the jurors to give to the alleged verbal agreement made prior to the preliminary proof? They were told in this instruction that the agreement need not be in writing; it need not be of sufficient formality or of a nature to be enforced in a court of law. Then what consideration were the jurors to give to Exhibit No. 2? They were told that whether or not it was an agreement or a contract that could be enforced in a court of law was immaterial—the material question was whether, when the applicant was about to make his sworn statement to enter the land (the preliminary proof), there was an agreement or understanding had between the parties in respect to the conveyance of the land.

But the plaintiff in error refers to the following in the transcript of record:

"There was evidence tending to show that most of the entrymen made a verbal contract with Miller prior to their filing upon the land, agreeing to transfer to Miller's company the land taken by them as soon as final proof was made. All of these persons, however, after filing, signed Exhibit 2. It was admitted also that this land taken by these entrymen was government land subject to entry under the timber and stone act. The making of the verbal agree-

ment, and the signing of Exhibits 1 and 2 herein, was the only evidence offered tending to show any agreement for the sale of this land by the entrymen."

It is contended that it appears from this statement that there were some entrymen who signed contracts who had not made any verbal contract with Miller prior to their filing; that the court did not make to the jury any distinction between the contracts made after and the contracts made before the filings, but permitted the jury to find the defendant guilty upon the theory that the contracts in writing, made after the filing and without prior oral agreement, were illegal and forbidden by the statute. We have seen that the court did clearly make a distinction in defining an "agreement," under the statute, and did not permit the jury to be in error upon that question; and, with respect to the substance of the offense, the indictment charged that the conspiracy was to suborn "a large number, to wit, one hundred, other persons to commit the offense of perjury." It follows that if the proof shows that most of the entrymen—that is to say, any number—made a contract prior to their filing upon land, agreeing to transfer the land upon final proof, the evidence was sufficient to establish the charge made in the indictment, and there was no error in the instruction to the jury as to its scope.

The court instructed the jury that:

"The entryman must always deal in good faith from the initiation of his claim; that is, from the time that he makes his application to purchase, which begins with the making of a sworn statement."

It is objected that under this instruction good faith did not terminate with the initiation of the claim, and that, from other parts of the instruction, good faith consisted, among other things, in not making any contract to convey the entryman's interest in the land until after the receiver's certificate was issued. The instruction quoted is part of a general instruction relating to the acquisition of public lands under the timber and stone act, in which the court instructed the jury that:

"A man cannot lawfully acquire the public lands of the United States, under this timber and stone act, if he has really made an agreement that others shall pay all the expense of his entry, and give him some money for exercising his right, and that, when he may acquire title to the land, he shall convey it to them, or to some one for them. If the agreement to convey exists and is understood between the parties, the law does not tolerate evasion by calling such an agreement a 'certificate' or 'option.' Nor, if the agreement actually exists, can the law be evaded by an endeavor to separate title to the timber upon the land from title to the land itself?"

On the other hand, the jury was instructed that:

"A person qualified under the law has a right to enter lands under the provisions of the timber and stone act, even though he considers, prior to the time of making his sworn statement and his final proof, a sale of it as soon as he can after he makes his final proof and obtains the usual receiver's receipt."

The court further instructed the jury:

"You will understand that the law does not make it obligatory that an entryman who acquires title under the timber and stone act shall keep the land, nor does it control his use or right to dispose of it for any period of time after he shall have complied with the provisions of the law in perfecting the right to

the claim. But the statute does denounce a prior agreement, the acting for another in the purchase from the government of the United States. However, if, when the title passes from the government to the entryman by receiver's receipt after final proof, no one save the purchaser has any claim upon it, or any contract or agreement for it, the law is satisfied. The act does not, in any respect, limit the dominion which the purchaser has over the land after he acquires his final receipt from the government, or restrict in the slightest his power of alienation after that time."

The court further instructed the jury:

"The dominion over the land which the purchaser acquires means the control and right which is his after the issuance of the final receipt by the land officers of the government, and not the right he possesses after filing only his sworn statement in the initiation of his claim."

These instructions were entirely correct as applied to the evidence before the court. Had there been evidence tending to show that the defendants had conspired together to suborn persons to commit perjury with respect to the making of final proofs, as was shown in the Williamson Case, then there might be some basis for a criticism of these instructions on the ground that they were too general; but upon the evidence in this case there is no substantial ground for objection. The court correctly stated the law applicable to the facts before the court, and the jury could not have been misled as to the application of the law to the facts in the case. It follows that, after carefully considering the record in this case in the light of the Williamson Case, we find no error in the proceedings.

The judgment of the Circuit Court is therefore affirmed.

ROSS, Circuit Judge (dissenting). The indictment in this case is in every respect similar to the indictment in the Williamson Case referred to in the foregoing opinion. The same judge presided on the trial of both cases, and the record makes it clear to my mind that the present case was tried and the jury instructed, as in that case, upon the theory that the indictment included a conspiracy not only in making the initial entry of the lands in question, but also in the making of final proof therefor, and that the law prohibited any contract by an entryman, prior to the making of final proof, for the conveyance of his interest in such land to another. The record here shows that evidence was introduced on the part of the government based on that theory, and such, I think, was the plain import of the instructions of the court complained of. As the Supreme Court held in the Williamson Case that such theory, as well as such instructions, were erroneous, I think it necessarily results that there was similar error in the present case. Therefore I dissent from the present judgment.