Madden, Judge,
delivered the opinion of the court ;■
Plaintiff was a bidder for the construction of an armory for the Government at West Point. It had sent in its formal sealed bid before the day-the bids were to be opened, intending to take advantage of the privilege offered in the invitation to bid of sending telegraphic modifications in time to be received before the hour set for opening the bids, which was 11 a. m. on March 16,1937.
*513 In addition to the bid on the principal project, on which plaintiff’s first figure was $620,000, plaintiff made a first bid of $14,000 on an alternate, given in the invitation, for concrete caissons instead of spread concrete footings for the foundation of the armory. Plaintiff intended to subcontract the caisson work, if it obtained the contract, and intended to use the offers of subcontractors as the basis of its telegraphic modification of this alternate. It, therefore, made no careful estimate in arriving at the $14,000 figure in its bid on the caisson alternate.
It was the custom of tradesmen in specialized lines, who desired to obtain subcontracts on such projects, to learn from trade papers the time of opening of bids, and to submit, without invitation, offers to contractors for the subcontracts. They withheld these offers until the last mail so as to reflect in them the latest available prices.
Plaintiff had also bid on another project of another owner of which the time for opening bids was 10 a. m. on the same day, March 16. Plaintiff’s morning mail usually was delivered at 8:30, and it wanted to see what offers from subcontractors were in that mail. The mail was late, because of a different carrier, and Eappoli, president of plaintiff, and others of his office staff went out and intercepted the mail man and got from him about 100 letters. Then they worked on the 10 o’clock bid. When they got to the 11 o’clock bid, here in question, they made modifications reducing the principal bid from $620,000 to some $530,000. As to the caisson alternate, there were no offers from subcontractors, so they had to figure out a final bid without the benefit of such offers.
An employee computed that there would be 1017 lineal feet of caissons, and Eappoli had in mind a figure of $30 a lineal foot for them. By an error of multiplication, or of transcribing figures, he set down as his product $10,510 instead of $30,510, the correct product. He then added to that figure the items shown in finding 7, which gave him a sum of $17,241. He rounded that to $17,000 and put into his telegram an increase of $3,000 over his earlier bid of $14,000 on the caisson alternate. The telegram was sent at *514 Id: 44 a. m. and arrived at West Point after 11 a. m. but while the opening of the bids was still proceeding.
•• ' Even plaintiff’s first bid- of $620,000, which it reduced by '$90,000 in its telegram, was lower than any other bid. On the caisson alternate, plaintiff’s telegraphed bid was, as we have'seen, $17,000. The other three bidders bid $48,000, -$60,000 and $65,000 respectively on this alternate. Captain •Gilman, the defendant’s constructing quartermaster at West Point was immediately aware that plaintiff’s caisson bid was, in some way, in error.
; Captain Gilman telephoned to the Department in Washington the day he opened the bids, and mailed the bids to Washington the same day. The next day, March 17, he wrote plaintiff that it was the low bidder and that its bid had been forwarded to the office of the Quartermaster General. Plaintiff received this letter on March 18, and Rap-poli, in going- over his figures, discovered the error in the figures on the caisson alternate. Pie immediately telephoned Captain Gilman, told him of the mistake and asked that ■the contract be awarded on the basis of the spread concrete ■footings, so that the caisson alternate would not be used. ■Pie asked for a conference with Gilman and - he and his lawyer,.Krohn went to West Point and had such a conference the next day, March 19. On that day, Gilman received instructions from the Quartermaster General’s office to award the contract to plaintiff. That office was, presumably, not aware of plaintiff’s claim of mistake.
At the March 19 conference Rappoli and Krohn raised the question of whether the defendant had the right to consider plaintiff’s telegraphic modification of its bid since it arrived after the hour set for opening. Gilman said that because plaintiff’s first bid was already lower than any other bid, and thus no other bidder was prejudiced, the defendant could consider plaintiff’s still lower telegraphic ■bid though it arrived late. He also said that caissons would •be used, rather than spread footings. As to the mistake .he said that the disparity in the bids made it obvious that a mistake had been made, but that proof would have to be submitted to the proper authorities. He arranged for a *515 conference at the Quartermaster General’s office in Washington for March 24.
The nest day, March 20, Gilman wrote Eappoli citing, as shown in finding 11, a decision of the Acting Comptroller General.to the effect that a conclusive showing of mistake must be made, to secure a correction after the opening of bids. Eappoli and his lawyer Eosenvinge went to Washington for the March 24 conference at the office of the Quartermaster General. That official was represented by Colonel Pitz, the contracting officer. Captain Gilman and other officials' of the Department were present. The two questions raised by plaintiff with Captain Gilman at West Point on March 19 were again raised. Colonel Pitz said, as to the first, that the Department had a right to consider plaintiff’s late bid because its earlier bid was lowrer than any other. As to the question of the mistake in the bid on the caisson alternate, he said the Department had no desire to take advantage of a contractor’s mistake; that the mistake j could be corrected if plaintiff would submit its proof) through proper channels.
During the conference Captain Gilman handed Eappoli an envelope containing the award of the contract on the basis of the telegraphic bids. Eosenvinge, for Eappoli, objected, because the mistake had not been corrected. Both parties were anxious to proceed with the contract without delay, in order to be safe against an expected increase in costs. Plaintiff’s representatives then agreed to accept the award, but made it plain that they expected the mistake to be corrected, and Colonel Pitz expressed no disagreement to this.
Plaintiff had its proof there at the time, and with the instruction of officials then present, a letter was addressed to Captain Gilman setting forth the circumstances of the mistake and attaching the evidence. Captain Gilman was already convinced that a mistake had been made, and Colonel Pitz indicated no doubt of that fact. • Colonel Pitz hsid in mind that the question would go to the Comptroller General, with the Department’s findings and recommendation, for decision, but he did not tell, plaintiff’s representatives' that, and they had no idea how such matters were decided, and supposed that the Department decided them itself.
*516 Captain Gilman transmitted plaintiff’s letter and proofs to the Department with a recommendation that consideration be given to correcting the error. The Department, by a communication to the Comptroller General which is not in evidence, recommended that the error be corrected.
Captain Gilman on April 5 sent the contract to plaintiff for signature, accompanied by a copy of a radiogram showing that the Department had made this favorable recommendation to the Comptroller General. On April 6 the Comptroller General ruled that the mistake would not be corrected. On April 9, plaintiff not having been advised of that ruling, and expecting the mistake to be corrected, signed the contract and began to perform it. On April 22 Captain Gilman advised plaintiff of the Comptroller General’s adverse ruling. From that time for some two years plaintiff attempted to get the matter reconsidered by the Comptroller General. Most of that time had expired before plaintiff was able to convince the Comptroller General of the fact that the mistake had been called to the attention of the Government before the award of the contract was made. But even then the decision was the same, though the reason was different.
The foregoing story began with a careless, but understandable mistake on the part of plaintiff. The mistake was apparent in six minutes to the first official of the Government who had anything to do with the transaction. Almost six years have now elapsed and the mistake is still uncorrected. Within two days after the mistake was made, and while the circumstances were such that the Government would not have been prejudiced to the amount of a penny, plaintiff asked that the mistake be corrected. Plaintiff was given an interview with a formidable group of officers and heard fair words from the officer entrusted by the Government to make the contract. It was told that the Department had no desire to take advantage of mistakes; that the mistake could be corrected by going through a routine; that the Government desired that the contract be made in the regular way so that the work could proceed promptly; that when the routine was finished plaintiff would receive what it was entitled to.
*517 Plaintiff, in natural reliance on these fair words, immediately started the routine. The mistake is still uncorreeted. The Department which had invited plaintiff to deal with it, for some reason not divulged to us abdicated its responsibility of dealing fairly with plaintiff, and turned that responsibility over to another Government official, with “findings and a recommendation.” The findings and recommendation were not put in evidence. Presumably the findings were cloudy and indefinite, for that other official did not become aware of what he regarded as one of the most important facts in the case until nearly two years after he had first decided it, although that fact was obvious to the officials of the Department who should have decided it. Plaintiff was advised that the recommendation was favorable, so presumably the findings were favorable to whatever extent they were intelligible. But we have not seen them.
Plaintiff asks us to reform the contract to make it conform to what it intended, and what the Government knew it intended, when the contract was made. The equity of plaintiff’s claim is obvious. The defendant here asserts that no mistake has been proved. We disagree. The fact that a mistake had been made was obvious to Captain Gilman when he looked at the bids. The fact of how the mistake had occurred was never denied by the responsible Department, and it recommended its correction.
The defendant contends that, admitting the mistake, it cannot be corrected because of the parol evidence rule. It says that it can, being fully aware that a contractor with whom it is dealing has made a mistake in his computation, persuade him by fair words and promises that the mistake will be corrected according to the Government’s routine, and thus induce him to sign the contract embodying the mistake, and then turn upon him and say, now you have signed it and you are caught.
Of course no single official of the Government has done all these things to this plaintiff. But if all the actions of all the officials involved had been taken by one person, they would have added up to what we have said. And they would have fallen well below required standards of fair dealing.
*518 We have'recently said that an entity such as a Government, which acts through many agents, must so coordinate the activities of its agents that the sum of their actions is up to the standard of fair dealing that is required of common men. Struck Construction Co. v. United States, decided May 4,1942. (96 C. Cls. 186.)
We think that the parol evidence rule does not prevent a ¡,’court from enforcing a promise made, concurrently with the ¡. execution of a contract, to correct a mistake in that contract, ■ it being to' the convenience of the parties that the contract, without the correction, be executed at the moment while time is taken to correct the mistake.
If the promise of Colonel Pitz, the Government’s contracting officer, that the mistake would be corrected, was not unconditional, what condition might have been intended ? The most probable one is that plaintiff should put its claim and proof of mistake through “regular channels”. This plaintiff did, so that condition was satisfied. Was there an implied condition that plaintiff’s proof should be convincing to the officials of the Department with which plaintiff was dealing? It was convincing, as shown by the Department’s recommendation. Was there a condition -that plaintiff’s proof should be convincing to another official of the Government with whom plaintiff.was not dealing? Such an unexpected condition could not be spelled out from silence, or from such words as “regular channels”. And if it could be spelled out, it would assume that that other official to whom the power of decision was committed would be given an intelligible statement of the facts by the Department which knew the facts, and would make a correct decision as to the law applicable to the true facts.
We think Colonel Pitz’s promise as understood by plaintiff was that the mistake would be corrected, if it was put through the routine of the Department and if there was no legal impediment to its correction. That was its reasonable meaning and legal effect. It was put through the routine, and there was no legal impediment to its correction. The Department could have corrected it itself and should have done so. It is now before us and we will do so.
*519 . Plaintiff may recover $22,000.
It is so ordered.
Whitaker, Judge; Littleton, Judge; and Whaley, Chief Justice, concur.
Jones, Judge, took no part in the decision of this case.