**UNITED STATES of America,**
**Plaintiff,**

v.

**SABIN METAL CORPORATION,**
**Defendant.**

United States District Court
S. D. New York.

June 4, 1957.

Paul W. Williams, U. S. Atty. for the Southern Dist. of New York, New York City, for plaintiff, Benjamin T. Richards, Jr., Asst. U. S. Atty., New York City, of counsel.

Irving Lederman, Brooklyn, for defendant.

LEVET, District Judge.

The United States of America, the plaintiff herein, is suing the defendant, Sabin Metal Corporation, for damages of $7,045.39, plus interest from May 12, 1950, as a result of defendant's alleged breach of a contract to purchase salvage scrap metal from it. The case was heard by the court without a jury.

### Findings of Fact

1. On March 22, 1950, the government's Contracting Officer of the 831st Air Force Specialized Depot at Shelby, Ohio, issued invitations for bids to purchase an estimated 13,359 pounds of assorted scrap Allison engine parts containing steel and silver.

2. Among the items offered for sale were:

"[Scrapped Allison Engine Parts containing steel and silver. Materi-

al packed in original manufacturer's pack.]

"1259 ea Connecting Rods, containing silver lined bearing. Approx. net wt. 8499 lbs."

3. Bids upon this scrap metal were invited, subject to a number of conditions which were set forth in the invitation as part of any contract for the purchase of the scrap. The following conditions were announced:

"5. Inspection. Bidders are invited and urged to inspect the property to be sold prior to submitting bids. Property will be available for inspection at the times specified in the invitation. No labor will be furnished for such purpose. In no case will failure to inspect be considered ground for a claim.

"6. Sale of Property 'As Is.' Unless otherwise specified, all property is sold 'as is;' the Government makes no guaranty, warranty, or representation express or implied, as to the kind, size, weight, quality, character, description or condition of any of the property, or its fitness for any use or purpose; this is not a sale by sample.

"7. Sale of Property 'Where Is:' Delivery. Unless otherwise specified the property is sold 'where is,' delivery shall be at the present location of the property, and removal shall be accomplished by the Purchaser at its expense; unless the Purchaser removes the property from such location within 10 days (or such other time as may be specified herein) after the date of the Government's Acceptance, the Government shall have the right to dispose of the property and hold the Purchaser responsible for any loss incurred by the Government as a result of the failure to pay for or remove the property; the time of removal, and such other details of removal as may not be provided for herein, shall be arranged with the Contracting Officer. Unless otherwise specified herein, payment in full must be made prior to removal of any property or immedi-

ately subsequent to weighing if weighing is necessary pursuant to General Provision 9.

"8. Adjustment for Variation in Quantity. As to any item for which a price per unit is specified in the Schedule of Property to be Sold, the Purchaser agrees to accept and pay at the quoted unit price for any number of units delivered or offered for delivery by the Government up to and including *twenty-five* per cent (25%) more or less than the estimated quantity stated in the schedule.

"9. Weighing. Where weighing is necessary to determine price hereunder, the Purchaser shall arrange for, and pay all expenses of weighing material, whether removal is by truck or by rail, including all switching charges incurred. In case of removal by truck, weighing shall be on (a) Government scales, or (b) other certified scales in the vicinity of present location or (c) certified scales in the vicinity of Purchaser's establishment, at the option of the Contracting Officer, and under his supervision. When removal is by rail, weighing shall be on railroad track scales or by other means acceptable to railroad for freight charge purposes. The weights thus determined shall govern payment.

"10. Responsibility for Property Sold. The Purchaser assumes all responsibility and liability for the property after the date of the Government's Acceptance. The Government will exercise its usual care for protection of the property up to the time limit of removal, but will not be responsible for any loss or damage from any cause whatsoever." (Exhibit 1)

4. The defendant, Sabin Metal Corporation, by its president Samuel Sabin, an experienced buyer of scrap metal and a licensed silver dealer, inspected the property before making its bid.

5. Bids on 13,359 pounds of scrap metal were opened on April 20, 1950. They varied from a low bid of $337.28 to

a high of $9,351.30, which was the defendant's bid at a unit price of 70¢ per pound. The second highest bid was $4,642.87. (Exhibit 2)

6. Major Irving C. Hindenburg of the Air Force, Staff Installation Engineer Officer, Supervisor of Air Force Contracts, in charge of sales of surplus property, who was present at the bid opening, took no special note of the variation except that the defendant's was the high bid. In his opinion there appeared nothing unusual in the variation of the salvage contracts since there was no way of estimating the value of this material. There was no upset price and no way of predicting the bids because the intended use by the bidder might affect the amount of the bid and because bids on salvage sales varied greatly.

7. On May 1, 1950, the Contracting Officer mailed a letter to the defendant notifying it that its bid of $9,351.30 (or 70¢ per pound) had been accepted and that under the contract it was required to remove the material within a ten-day period, which would expire on May 12, 1950.

8. Claiming it had made an error in computing its bid on the first item, on May 2, 1950, the defendant wrote the following letter to the Salvage Officer of the 831st Air Force Specialized Depot, Shelby, Ohio, which was received by the Salvage Officer after his acceptance of the defendant's bid:

"We have checked our records on Invitation No. 33–101–s–50–14. In computing our bid we made an error in the first item, which consisted of 1,259 pieces, which we figured at two bearings per piece or 2618 pieces, whereas our bookkeeper actually multiplied the same item twice. The difference in that particular item is $3,350.00

"We would therefore appreciate, in-as-much-as the award has not been made, your accepting our revised bid of $5,896.00, or refunding our deposit.

"We regret our causing you any inconvenience, but as the bid stands now, we would lose $3,000.00." (Exhibit 4)

9. Thereafter, certain correspondence ensued between the defendant and the Contracting Officer, wherein the defendant sought to be relieved from its bid or to reduce it. Finally, after consideration of the defendant's claim, the Contracting Officer wrote to the defendant on July 13, 1950, as follows:

"Subject: Invitation to Bid No. 33–101–s–50–14

Contract No. AF 33(101)s–95

"You are advised that you are being placed in default of subject contract.

"This depot is taking action in accordance with General Provision No. 7 of subject Invitation to Bid to dispose of the balance of material on Item 1 of subject Contract." (Exhibit 16)

10. Thereafter, the same material was advertised for sale pursuant to the original invitation to bid and was sold to the highest bidder, C. L. Pratt, Jr., refiner, for the total amount of $4,356.91.

11. On January 1, 1952, a Certificate of Indebtedness was issued by the General Accounting Office, wherein the defendant's liability to the government was computed as follows:

"Purchase price of the material under the defaulted contract — $ 9,351.30

"Amount received after readvertisement of the property — 3,573.21

"Loss to the Government on account of your default — 5,778.09

"Less: Deposit furnished with your bid — 2,000.00

"Balance due the United States — $ 3,778.09"

(Exhibit B)

12. This Certificate failed to take into account the actual weight of the scrap metal and was based solely upon the defendant's bid. It did not include the adjustment for variation in quantity, which was one of the conditions of the contract. This adjustment could vary within a range of 25% of the estimated quantity stated in the schedule.

13. The estimated total weight of the material was 13,359 pounds, whereas the actual weight was found to be 16,289 pounds, which was within the permissible 25% variation.

14. Subsequently, a Certificate of Indebtedness was issued on June 16, 1953, superseding the original Certificate, and certifying the loss to the government and computing defendant's indebtedness as follows:

"Purchase price of the total quantity of material actually sold under the defaulted contract—

| | | |
|---|---|---|
| "16,289 lbs. at $0.70 per pound | | $11,402.30 |
| "Amount received after readvertisement of the property— | | |
| "16,289 lbs. at $0.2674755 per pound | | 4,356.91 |
| "Loss to the Government on account of your default | | $ 7,045.39" |

(Exhibit 20)

15. Thereafter, the government instituted this action seeking damages of $7,045.39 plus interest thereon from May 12, 1950.

16. In its letter of May 2, 1950, defendant stated that it erroneously assumed that each of the 1,259 pieces contained two silver-lined bearings. However, in a letter dated June 22, 1950 (Exhibit 13) the defendant explained that the error was due to a chart in its office which showed that the bearings contained 19½% silver rather than their actual silver content of 10%.

17. Although the defendant contends that the discrepancy in bids between the second highest bid and its bid was such that plaintiff should have known there was an eror, I find that in the sale of salvage property a wide range of variation among the bids is customary.

### Discussion.

■ The defendant contends that the government's reservation of a right to reject any or all bids makes the contract in this case unenforceable. However, the government's invitation to bid was merely a request for offers and was not an operative offer. The defendant's bid constituted the offer and the government's acceptance completed the contract. Levinson v. United States, 258 U.S. 198, 42 S.Ct. 275, 66 L.Ed. 563; 1 Williston, Contracts, § 31; 1 Corbin, Contracts, § 24. The fact that the government reserved the right to reject any or all offers did not prevent the creation of mutual obligations after it accepted the defendant's offer. Consequently, there is no merit to defendant's claim of lack of mutuality.

■■ The defendant's offer to purchase the scrap metal did not specify the manner in which the government was to communicate its acceptance and, therefore, in accordance with the well-established common-law principle, the mailing of the government's notice of acceptance on May 1, 1950, completed the contract. Adams v. Lindsell, 1 B. & Ald. 681; Tayloe v. Merchants' Fire Ins. Co., 9 How. 390, 13 L.Ed. 187; Patrick v. Bowman, 149 U.S. 411, 13 S.Ct. 811, 866, 37 L.Ed. 790; 1 Williston, Contracts, § 81; 1 Corbin, Contracts, § 78; Restatement of Contracts, § 64. The defendant's attempted revocation by its letter of May 2, 1950, never became effective since an acceptance prior to a communicated revocation will make a binding contract. Tayloe v. Merchants' Fire Ins. Co., supra; Patrick v. Bow-

man, supra; 1 Williston, Contracts, § 56; 1 Corbin, Contracts, § 39; Restatement of Contracts, § 41.

■ It is also the defendant's contention that it was guilty of a unilateral mistake which was known to the government, or of which the government had reason to know because of the amount of the bid. Accordingly, the defendant requests that it be relieved of its obligations under the contract. The enforcement of the contract between the government and the defendant is governed by substantive federal law. Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838; United States v. Allegheny County, 322 U.S. 174, 64 S. Ct. 908, 88 L.Ed. 1209; United States v. Standard Oil Co., 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067.

■ The general principle applicable to this case was stated as follows in Saligman v. United States, D.C.E.D.Pa. 1944, 56 F.Supp. 505, 507:

"* * * Ordinarily no relief will be granted to a party to an executory contract in the case of a unilateral mistake. In such case when a bid has been accepted the bidder who has made a mistake will be bound and must bear the consequences thereof. Ellicott Machine Co. v. United States, 44 Ct.Cl. 127; American Water Softener Co. v. United States, 50 Ct.Cl. 209; United States v. Conti, 1 Cir., 119 F.2d 652; Steinmeyer v. Schroeppel, 226 Ill. 9, 80 N.E. 564, 10 L.R. A.,N.S., 114, 117 Am.St.Rep. 224; Leonard v. Howard, 67 Or. 203, 135 P. 549; Star-Chronicle Pub. Co. v. New York Evening Post, Inc., 2 Cir., 256 F. 435, 442; and Moffett, Hodgkins & Clarke Co. v. City of Rochester, 2 Cir., 91 F. 28.

"However, if the party receiving the offer or the bid, knows or has reason to know because of the amount of the bid, or otherwise, that the bidder made a mistake, the contract is voidable by the bidder. 5 Williston, Contracts, Sec. 1598; 2 Restatement, Contracts, Sec. 503; Alta Electric & Mechanical Co. v. United States, 90 Ct. Cl. 466; Kemp v. United States, D.C.D.Md.1941, 38 F.Supp. 568; State of Connecticut v. F. H. McGraw & Co., D.C.D.Conn.1941, 41 F.Supp. 369. * * *"

■■ Here, no actual or constructive notice of the defendant's unilateral error came to the government's attention before it accepted the bid. The responsibility for the preparation of bids is entirely that of the bidders. Frazier-Davis Construction Co. v. United States, 100 Ct.Cl. 120, 163.

■ This being a sale of surplus engine parts, the Contracting Officer had no method of knowing that there was an error in the defendant's bid. The government was interested only in getting the highest possible price for the material to be sold; it was not in the metal trade. There is no reason why the spread in bids should have appeared palpable to the government. The administrative agency was not required to employ or utilize experts for the benefit of the defendant, nor to assume the burden of examining every low bid for possible error by the bidder. Saligman v. United States, supra.

As stated in Hyde Park Clothes v. United States, 1949, 84 F.Supp. 589, 592, 114 Ct.Cl. 424:

"* * * There is nothing in the circumstances of this case indicating that the Government either knew or had reason to know that the bidder had made a mistake. There was no fraud or concealment on the part of the Government, the contract was valid on its face * *."

The error clearly resulted from the defendant's negligence in assuming that each of the 1,259 connecting rods in item 1 contained two silver-lined bearings.

Relief from a unilateral mistake by a party to a contract has been granted when the other party was, or should have been, aware of the error. For example, in Moffett, Hodgkins & Clarke

Co. v. City of Rochester, 178 U.S. 373, 20 S.Ct. 957, 44 L.Ed. 1108, the bidder called attention to the error before an award had been made and asked permission to withdraw its bid. In Kemp v. United States, D.C.D.Md.1941, 38 F. Supp. 568, the purchase of a drilling machine was involved and it appeared that the government agents knew there was an obvious error. In Alta Electric & Mechanical Co. Inc., v. United States, 90 Ct.Cl. 466, before the bid was accepted the plaintiff wrote to the Navy Department calling attention to certain misinterpretations of price quotations by the plaintiff's subcontractor and requested permission to withdraw the bid. The bid was based on an estimate furnished by the plaintiff's subcontractor and the Court held that with these conditions the plaintiff should have been permitted to withdraw its bid without penalty. In Edmund J. Rappoli Co., Inc., v. United States, 98 Ct.Cl. 499, the accepted bid was about one-third of the next lowest bid and the plaintiff in that case also notified the defendant's representative of the mistake before its bid was accepted.

The facts in this case are not of the type involved in the above-mentioned cases. Here there was no misrepresentation by the government of any fact which it was under a legal duty to disclose to the bidders or of any fact known to it and unknown and unavailable to the bidders, and the proof does not show fraud, duress, accident or such mistake as would justify the application of equitable principles to relieve the defendant from the contract. See Dougherty v. United States, 102 Ct.Cl. 249, 259.

In 16 Decisions of the Acting Comptroller General of the United States, 596 597, the principles peculiarly applying to this case are stated:

"The bids here in question were on waste material and salvage property sold 'as is' and 'where is' as distinguished from bids for the performance of work or the furnishings of supplies, equipment, etc. Consequently there might be expected a wide range in the bids which would be based more or less upon the use to which the property was to be put by the particular bidder or the chance of resale thereof. The mere difference in the prices bid for such property would not necessarily put the contracting officer on notice of a mistake as would a like difference in the prices quoted on new equipment, supplies, etc., to be furnished."

See also 17 Decisions of the Acting Comptroller General of the United States, 388. The same principles were again set forth in 17 Decisions of the Acting Comptroller General of the United States, 601, 603:

"The bids here in question were on used equipment and materials no longer fit for service as distinguished from bids for the performance of work, for the furnishing of supplies, equipment, etc. Consequently, there might be expected a wide range in the bids which would be based more or less upon the use to which the property was to be put by the particular bidder or the chance of resale thereof. The mere difference in the prices bid for such property would not necessarily put the contracting officer on notice of a mistake as would a like difference in the prices quoted for furnishing new equipment or supplies to be purchased by the Government. See decision of December 17, 1936, 16 Comp.Gen. 596."

In my opinion there was nothing to indicate to the government, nor did it know, that a substantial error had been made. The mistake arose solely from the negligence of the defendant, Sabin Metal Corporation.

The defendant contends that since it offered to settle with the plaintiff for an amount greater than the sum secured by the government on the resale of the merchandise, that the government cannot in this action recover more than the sum offered by the defendant. This, of course, is without foundation. The plaintiff's measure of damages is

the difference between the original contract price and the amount received on the resale. The defendant's offer to the plaintiff of something other than that to which it is entitled as compensation is not admissible in mitigation. 25 C.J.S. Damages § 96, pp. 643–644; Nash v. Minnesota Title Ins. & Trust Co., 163 Mass. 574, 40 N.E. 1039, 28 L.R.A. 753. See Duncan v. Wohl, South & Co., 201 App.Div. 737, 740, 195 N.Y.S. 381.

### Conclusions of Law.

1. The court has jurisdiction of the parties and of the subject matter herein.

2. The defendant is not entitled to relief by reason of its alleged mistake.

3. The plaintiff is entitled to judgment in the amount of $7,045.39, together with interest from May 12, 1950, and the costs of this action.