**Worth JAMES dba Worth James Construction Co., Plaintiff,**

v.

**CENTEX CONSTRUCTION CO., Inc., Defendant.**

**No. LR–64–C–165.**

United States District Court
E. D. Arkansas, W. D.
June 24, 1966.

Herschel H. Friday, of Smith, Williams, Friday & Bowen, Little Rock, Ark., for plaintiff.

Leon B. Catlett, of Catlett & Henderson, Little Rock, Ark., for defendant.

MEMORANDUM OPINION

HENLEY, Chief Judge.

This is a suit in equity for rescission of a contract for the construction of certain sanitary and storm sewers in a residential subdivision in the City of New Orleans, Louisiana. The defendant denies that plaintiff is entitled to rescission and has filed a counterclaim against plaintiff and the surety on his performance bond seeking damages for alleged breach of contract by plaintiff.

Plaintiff, Worth James, is an individual citizen of Arkansas who does business under the name of Worth James Construction Co. Defendant, Centex Construction Co. (now Centex Corporation), is a corporation domiciled in the State of Texas and with its principal place of business in that State. The amount in controversy is in excess of $10,000, exclusive of interest and costs.

The case has been tried to the Court, and this memorandum incorporates the Court's findings of fact and conclusions of law. Up to a point the facts are not disputed.

Plaintiff is an experienced public contractor who for a number of years has specialized in the installation of underground utilities such as storm sewers, sanitary sewers, water lines, and the like. In August 1963 plaintiff was invited to submit a bid on a subcontract for the installation of storm sewers and sanitary sewers, with appurtenances, in Section 4 of the New Orleans subdivision known as "Village de l'Est." The subdivision was owned by a development company known as "New Orleans East," and the prime contract for the construction of the subdivision, including streets and water and sewer systems, was held by Centex Construction Co., defendant herein.[1]

The subcontract with which the Court is concerned was to be performed in accordance with plans and specifications prepared by the engineering firm of Adloe Orr, Jr. and Associates of New Orleans, and in accordance with the specifications and requirements of Sewerage and Water Board of the City of New Orleans, hereinafter the Board.

Centex supplied plaintiff with the drawings prepared by the Orr concern, and plaintiff obtained a set of specifications from the Board. Plaintiff also made a one day's trip to New Orleans in the course of which he examined the job site to some extent and also observed certain storm and sanitary sewer work being done by another contractor in another section of the subdivision immediately adjacent to Section 4 thereof.

On the basis of the documents in his possession, considered in connection with what he had learned on his trip to New Orleans, plaintiff submitted to Centex a low bid which, after adjustments, resulted in the contract being awarded to plaintiff at a basic price of $431,861.81.

Four other contractors, three of them from New Orleans, submitted bids much in excess of that of plaintiff. Those bids were as follows:

| | |
|---|---|
| Navajo Constructors, Houston, Texas | $773,432.75 |
| Walter Villere Co. and Drennen Construction Co. (Villere-Drennen), New Orleans, Louisiana | 569,439.30 |
| Pratt Farnsworth, Inc. (Farnsworth), New Orleans Louisiana | 547,654.00 |
| Boh Brothers Construction Co. (Boh Bros.) New Orleans, Louisiana | 532,334.50 |

---

1. The evidence disclosed that prior to August 1963 plaintiff had been awarded subcontracts by Centex and had performed them. These subcontracts covered work in Arkansas and in northern Louisiana.

In October 1963 plaintiff moved men, equipment, and material to the job site preparatory to commencing performance of the work, and some work was in fact performed. At this stage of the transaction plaintiff learned for the first time that the Board's specifications for sewer manholes and for the laying of pipe at certain depths were somewhat more rigorous than the ones set forth in the set of specifications which a representative of the Board had furnished plaintiff when he was in New Orleans prior to submitting his bid.

While plaintiff was not pleased to learn about the more rigorous specifications prescribed by the Board, he probably would have gone ahead with the work except for the fact that in early November he discovered that he would have to excavate on the average more than two feet deeper than he had expected and that he would not be paid for the extra excavation. When plaintiff learned of that fact, he refused to continue and filed this suit for rescission.

When Centex learned that plaintiff was not going to perform, new bids were solicited and the work was re-let to Farnsworth at a price of $99,372.19 in excess of plaintiff's basic contract price. It is that excess plus certain expenses which Centex by its counterclaim is seeking to recover from plaintiff and from plaintiff's surety.

Ignoring certain allegations of plaintiff's pleadings which were not relied upon ultimately, it is the theory of the plaintiff that he was induced by Centex to submit a grossly inadequate bid; that the contract into which he entered but did not perform was the result of a non-negligent mistake on his part, induced by Centex, and that he is entitled to rescission.

The position of Centex is that the contract was not the result of any mistake, negligent or otherwise, on the part of plaintiff, and that plaintiff simply refused to perform his obligations when he found that it would not be profitable for him to do so. Alternatively, Centex says that if plaintiff made any mistake when he submitted his bid, the mistake was negligent, and that in any event the mistake, whether negligent or non-negligent, was not induced or brought about by any words or conduct on the part of Centex.

Assuming that plaintiff is not entitled to rescission, it seems clear that he and his bonding company are liable to Centex for breach of contract, and there is no substantial dispute between the parties as to the amount which Centex is entitled to recover, if it is entitled to recover anything.

At the outset the record suggested the presence of an issue as to whether the rights of the parties are governed by Arkansas law or by the law of Louisiana. There does not seem to be any material difference between the relevant law of the two States, and the Court sees no occasion to deal with the conflicts issue.

Counsel on both sides are familiar and do not seem to quarrel with this Court's views as to the contract rescission on account of unilateral mistake expressed in Standard Accident Insurance Co. v. Wilmans, E.D.Ark., 214 F.Supp. 53, 61–62. It was there said:

"It is settled that a court of equity will in certain circumstances grant rescission of a contract entered into as a result of a unilateral mistake of one of the parties, where that mistake has been produced by the conduct of the other party and where the parties can be put in status quo.

"The general rule is stated as follows in an Annotation appearing in 59 A.L.R. 809:

"Equitable relief from a mutual mistake is frequently given by a reformation of the contract. But a contract will not be reformed for a unilateral mistake. Equitable relief may, however, be given from a unilateral mistake by a rescission of the contract. Essential conditions to such relief are: (1) The mistake must be of so grave a consequence that to enforce the contract as actually made would be un-

conscionable. (2) The matter as to which the mistake was made must relate to a material feature of the contract. (3) Generally the mistake must have occurred notwithstanding the exercise of ordinary diligence by the party making the mistake. (4) It must be possible to give relief by way of rescission without serious prejudice to the other party except the loss of his bargain. In other words, it must be possible to put him in status quo.'

"In 17 C.J.S. Contracts, § 143, p. 495, it is said:

"'Ordinarily, a unilateral mistake affords no ground for avoiding a contract, although it may do so where it results in a complete difference in subject matter so as to preclude the existence of consideration, or where it is caused by, or known, to the other party.'

And, while the mistake must have been caused by the other party, the conduct which produces the mistake need not be in itself fraudulent or inequitable. See Annotation, 59 A.L.R. 809, 817–818, and cases there cited including Hubbert v. Fagan, 99 Ark. 480, 138 S.W. 1001.

"In Frazer v. State Bank of Decatur, 101 Ark. 135, 141 S.W. 941, there was a unilateral mistake on the part of plaintiff in accepting a certain instrument as a renewal of an earlier obligation, which mistake was caused by the action of agents of the defendant in failing to disclose that they had made a material alteration in the renewal instrument before executing it and delivering it to plaintiff. Plaintiff sued at law on the original undertaking and was permitted to prevail. The Supreme Court of Arkansas after pointing out that a contract cannot be reformed on account of a unilateral mistake went on to say (p. 141 of 101 Ark., p. 943 of 141 S.W.):

"'* * * But a different question is presented where one of the parties to a contract seeks to have it rescinded because of a mistake on his part, for that makes only a case of there being no contract between the parties on account of the fact that there has not been a meeting of the minds of the contracting parties. * * *'

"Frazer, supra, was cited with approval in Fleischer v. McGehee, 111 Ark. 626, 163 S.W. 169. In Fleischer appellant purchased lands belonging to appellee under the mistaken belief that he was purchasing adjoining lands belonging to a third person. While fraudulent misrepresentations on the part of appellee were alleged, they were not proven. Rescission was allowed, the Court pointing out that the mistake of appellant was not due to negligence, and that the status quo could be restored by a reconveyance of the lands. Both the Frazer case and the Fleischer case were cited in Murphy v. Steel, 169 Ark. 299, 274 S.W. 6, wherein rescission was granted on account of a unilateral mistake in the last description appearing in a deed.

"Although this is not a suit for rescission as such, the Court is convinced that the principles and authorities above stated and cited are applicable and support the result here reached.

"As has been shown, the policy in suit was issued as the result of a mistake on the part of McDonald going to the substance of the contract. This mistake was not due to negligence on the part of McDonald but was due to Wilmans' failure to make disclosures which he should have made, and the status quo can be restored by plaintiff's returning the premium paid by Mr. Wilmans. It is true that Wilmans will lose the benefit of his insurance protection, but that loss is due to his own failure to make disclosure, and it is but just that he should bear that loss. The American Laundry Machinery Co. v. Whitlow, 198 Ark. 175, 127 S.W.2d 817."

Even if not caused by the party against whom rescission is sought, a unilateral mistake of fact may be ground for rescission, provided that the mistake is non-negligent, is known to such party, or is so gross or palpable that he is chargeable with knowledge of it. In such circumstances it would be unconscionable to hold the mistaken party to his undertaking, and the attempt of the other party to take advantage of the mistake may be considered a species of fraud. See 17 C.J.S. Contracts § 143, pp. 892–893; Reynolds v. Texarkana Construction Co., 237 Ark. 583, 374 S.W.2d 818; Hubbart v. Fagan, supra. In this connection in Hubbart, the Court said (p. 486 of 99 Ark., p. 1002 of 138 S.W.):

"* * * 'Where relief is given because of the mistake of one party alone, it is where it is induced by the conduct of the other party, or because the other seeks unconscionably to take advantage of it, and the ground of jurisdiction is really fraud.' 16 Cyc. 69. See Rector v. Collins, 46 Ark. [167] 176, quoting 2 Pom.Eq.Jur. § 843. * * * *"

The principle just stated was recognized in relation to a building or construction contract in Reynolds v. Texarkana Construction Co., supra, and would seem to be particularly applicable to contracts of those types. 13 Am.Jur. 2d, Building & Construction Contracts, § 107; 17 C.J.S. supra, Contracts, § 143, p. 892, n. 39.10; Nolan Bros., Inc. v. United States for use of Fox Brothers Construction Co., 10 Cir., 266 F.2d 143; United States v. Sabin Metal Corporation, 2 Cir., 253 F.2d 956, aff'g United States v. Sabin Metal Corporation, S.D. N.Y., 151 F.Supp. 683; Peerless Casualty Co. v. Housing Authority of the City of Hazelhurst, 5 Cir., 228 F.2d 376; Saligman v. United States, E.D.Pa., 56 F. Supp. 505.

Turning now to the issues, the Court finds, first, that plaintiff's bid which Centex accepted and the contract into which the parties entered were the result of a gross mistake on the part of plaintiff as to the depths of the ditches which he would be required to dig and as to the basis of the payments to be made to him for such excavation. The Court also finds that plaintiff was mistaken with respect to certain of the Board's specifications which he would have been required to meet had he performed his contract, but the Court does not consider that mistake to have been of great magnitude, or that standing alone it would have prompted plaintiff to refuse to perform his contract, or that it would have justified rescission.

The Court further finds that when Centex and plaintiff entered into their contract, the former knew that the latter had made a serious mistake and also knew or should have known the nature of the mistake.

The difficult questions in the case are whether plaintiff's mistake was non-negligent and whether the mistake was induced or caused by acts or representations of Centex. In passing upon those questions there are certain underlying facts which must be kept in mind.

Sewer contractors, whether operating in Arkansas, Texas, Louisiana, or anywhere else, expect to be paid in full for the excavations which they are required to make. They expect to be paid from the top of the ground to the bottom of the trench or ditch in which the pipe is to be laid.

Regardless of where ditches or trenches are being dug, the cost of the excavation increases progressively, not mathematically, with the depth of the trench. That is to say that if a ditch 16 feet deep is to be dug, it costs more in proportion to excavate from the 14 foot to the 16 foot depth than it costs to dig from the 12 foot to the 14 foot depth. And, a two foot variation at any substantial depth level involves a very substantial cost differential. If a contractor submits a bid on the impression that his ditches are to be two feet shallower than actually called for by the plans and specifications by reference to which he bids, he is in serious trouble indeed if he is awarded the contract and is required to perform

it according to the plans and specifications.

As is well known, the terrain of New Orleans and its surrounding area is extremely low lying and flat, and the ground water level is quite close to the surface. Those observations apply in general to the area included in the subdivision with which the Court is concerned.

Most sewers in New Orleans are laid in the streets. When a subdivision is laid out and built, the streets are usually constructed and the curbs and gutters laid before the sewer lines are put into the ground. And that procedure was followed in sections of "Village de l'Est" which were laid out and constructed in advance of Section 4 to which plaintiff's contract related.

Where sewers are laid in the streets, the latter have to be reworked after the sewers are put down, and this involves duplication of effort and extra cost to the owner and contractors concerned with street construction.

The evidence reflects that prior to the commencement of work in Section 4 of "Village de l'Est," the Board had agreed that in that Section the sewers might be laid in the "parkways" adjacent to but outside the curblines of the streets. That much was known to plaintiff when he submitted his bid and entered into his contract.

The documents which plaintiff had at hand when he prepared and submitted his bid consisted of the engineer's drawings of Section 4, a so-called "Schedule of Bid Price" setting out certain statements of quantities of the work to be performed, and the set of specifications, in pamphlet form, which plaintiff had obtained from the Board. The drawings and the Schedule of Bid Price which plaintiff had did not differ from those furnished other contractors who bid on the job.

The Schedule of Bid Price, among other things, called for various quantities of pipe of various diameters to be laid in various depth brackets; those brackets were two foot brackets ranging from the 6'–8' bracket through the 12'–14' bracket. The schedule also called for the construction of manholes of various depths.

The Board's specifications indicated that contract quantities might vary by as much as 10 percent either way. They also indicated that excavations would be measured from average ground level between manholes to the bottom of the foundation material underlying the pipe, and that payment would be on the basis of such measurements.

The drawings which were before plaintiff did not show any ground profile line, but they did show a profile line designated as the proposed "curb line" profile. The drawings also showed vertical distances from the proposed curb line to the bottom of the trenches which were to be dug for the laying of the pipe.[2]

With those materials before him plaintiff proceeded to make two assumptions in preparing and submitting his bid. He first assumed that the depths appearing in the Schedule of Bid Price were from ground level to the bottom of the trenches. He then assumed that the profile of the proposed curb line was essentially the same as a ground line profile. In making the latter assumption plaintiff may have been influenced by his knowledge that the ground in and around New Orleans is generally flat.

Both of those assumptions turned out to be wrong. The depths set out in the Schedule of Bid Price were not depths from ground level to the bottom of the trenches; they were depths from the top of the curb line profile shown on the drawings to the bottom of the proposed trenches. And, in Section 4 of "Village de l'Est" the curb line profile shown on the drawings was not essentially the

2. The foregoing abstract of the contents of the specifications, Schedule of Bid Price, and the drawings is doubtless oversimplied but is believed sufficiently accurate for purposes of this memorandum.

same as a profile of the ground line along the routes of the proposed lines.

The incorrectness of plaintiff's first assumption would not have been of great importance if his second assumption had been correct or substantially correct. Unfortunately for plaintiff, however, the level of the ground on which he would be required to excavate was, in this particular and somewhat unique area, about two feet higher on the average than the curb line shown on the drawings. This meant that if plaintiff performed his contract, he would have to excavate to depths averaging two feet in excess of those to which he had calculated he would have to dig, and the expense of the excavation would have greatly exceeded that which he had estimated.

Plaintiff learned of his mistake when he was furnished "cut sheets" directing him to dig to the greater depths. It was when plaintiff learned of that mistake, and when he learned also that defendant did not propose to pay him for excavation from ground line to the bottom of the trenches but only from the elevation of the top of the "curb line" to the bottom of the trenches, that plaintiff refused to perform the contract.[3]

■ Having described plaintiff's mistake, it becomes necessary for the Court to determine whether it was negligent or non-negligent, and since plaintiff has brought this action seeking equitable relief from his contract obligation, the Court is of the opinion that the burden is upon the plaintiff to show that his mistake was non-negligent. While the question is a close one, the Court finds that plaintiff has discharged that burden.

The local contractors who bid on this job in opposition to plaintiff had personal knowledge, not based on the drawings or Schedule of Bid Price, that the ground level of the parkways in Section 4 of the subdivision was about two feet higher than the curb line, and that they would have to excavate about two feet deeper than the drawings and the schedule indicated. They also knew, apart from the bidding documents, that they would be paid only on the basis of depths from the top of the curb line to the bottom of the trenches. And they took that personal knowledge into account when they submitted their bids which, as indicated, were very much higher than that submitted by plaintiff. In other words, they based their bids on the documents plus their personal knowledge of the situation and set their unit prices high enough to compensate them for the extra excavation.

When the work was re-let to Farnsworth, its contract price corresponded closely to the initial bid submitted by it, which bid was the third low of the original bids. The president of Farnsworth testified at the trial that both of the bids which he submitted to defendant were based on the personal knowledge which he had of the situation in addition to the information disclosed by the bidding documents, and the Court thinks that if plaintiff had been in possession of that information, his bid would probably have been in line with those of the other contractors.

It is possible, of course, that had plaintiff spent more time at the job site and had he made more detailed inquiries before his return to Little Rock, he would have learned what his local competitors already knew and would have governed himself accordingly.

■■ But, the Court does not think that ordinary care required him to do

3. The evidence reflects that when the dispute arose, defendant agreed to scrape off with its own equipment the top two feet of topsoil along the parkways so as to eliminate the depth differential. Plaintiff refused to accept that solution to the problem because a removal of the top soil would have destroyed the ground surface on which plaintiff's machinery would have operated normally and would have required the machinery to operate in mud and water. The Court agrees with plaintiff that the proposed solution was not a feasible one, and finds that plaintiff was not required to accept it and did not act unreasonably in refusing to do so.

more than he did. In the absence of knowledge or notice to the contrary, a contractor has a right to assume that the plans and specifications and other material furnished him are complete and describe the work correctly. The Court is not persuaded that what plaintiff observed while he was in New Orleans put him on notice that the drawings and Schedule of Bid Price were incomplete or inaccurate.

Nor does the Court think that plaintiff was negligent in assuming that the curb line profile shown on the drawings did not differ substantially from ground level. The evidence before the Court is to the effect that the practice of showing curb line profiles rather than ground line profiles on drawings for sewer projects tends to be limited to the area of New Orleans. The Court has adverted more than once to the flatness of the terrain in that area, and in view of that characteristic of the land a general assumption that there is very little difference between curb elevations and ground elevations is certainly not a far fetched or unreasonable one. As a matter of fact, in general such an assumption would be valid, and the assumption that plaintiff made would have been valid for much of the "Village de l'Est" project; it simply happened not to be valid with respect to Section 4 of that project.

It is clear to the Court that Centex knew when it compared plaintiffs bid with the other bids that he had made a serious mistake. Plaintiff's bid was entirely out of line with the other bids and was slightly more than $100,000 lower than the next low bid. Centex knew that plaintiff was an experienced contractor. Centex also knew that plaintiff was not accustomed to performing work in the New Orleans area, and it knew that the depths to be excavated were in excess of the depths shown on the Schedule of Bid Price but that payment would be made on the basis of the depths shown on that schedule. The Court is of the opinion that in the circumstances the representatives of Centex who examined and compared the bids could not have failed to realize that plaintiff must have based his bid on the assumption that the depths shown on the schedule were depths from the top of the ground to the bottom of the trenches and that he would be paid for such depths.

The Court finds further that in legal and equitable contemplation the mistake of plaintiff was induced by Centex in that Centex furnished plaintiff with bidding documents which did not tell the whole story and were misleading. The Court does not know that Centex had any intention of defrauding plaintiff or of misleading him, but what was done had a natural tendency to mislead and did mislead. One can induce a person to act by silence as well as by spoken words or operative acts. It would have been easy for Centex to have told plaintiff that he should take into consideration the fact that he would have to dig from a ground surface about two feet above the curb line, and that the depths with respect to which payments would be made would be calculated from the curb line and not from the ground line. In common fairness Centex should have given plaintiff that information in advance and not left it to him to discover for himself, or should have permitted him to withdraw his bid or to rebid when it appeared that a serious mistake had been made.

A very recent decision of the Supreme Court of Arkansas indicates that plaintiff may tend to ignore written contractual provisions which do not correspond to his understanding of the agreement between himself and the other contracting party. James v. P. B. Price Construction Co., 240 Ark. 628, 401 S.W.2d 206. The Court is persuaded in this case, however, that plaintiff was led by defendant into an honest, non-negligent mistake, and that defendant should not be permitted to enrich itself unjustly at the expense of plaintiff, which would be the result of denying rescission.

Rescission will be granted, and defendant's counterclaim will be dismissed.